1  McCormick, Barstow, Sheppard,
   Wayte & Carruth LLP
2  Hagop T. Bedoyan, #131285
    *hagop.bedoyan@mccormickbarstow.com*
3  Shane G. Smith, #272630
    *Shane.smith@mccormickbarstow.com*
4  Matthew P. Bunting, #306034
    *matthew.bunting@mccormickbarstow.com*
5  7647 North Fresno Street
   Fresno, California 93720
6  Telephone:     (559) 433-1300
   Facsimile:     (559) 433-2300
7
   Starnes PLLC
8  Thomas E. Starnes [*Pro Hac Vice Pending*]
    *tomstarnes@starnespllc.com*
9  5416 32nd St. NW
   Washington, DC 20015
10 Telephone: (202) 630-9948
   Facsimile: (202) 998-9191
11
   Attorneys for Creditor The African Methodist
12 Episcopal Zion Church

13              UNITED STATES BANKRUPTCY COURT

14      EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

15 | In re                                    | Case No. 20-23726-A

16 | AME ZION WESTERN EPISCOPAL               | Chapter 11
   | DISTRICT,
17 |                                          | Adversary No.
   |          Debtor-In-Possession.
18 | AFRICAN METHODIST EPISCOPAL              | **COMPLAINT FOR INJUNCTIVE**
   | CHURCH, a California corporation (dba First | **RELIEF, FOR DECLARATORY**
19 | AME Zion Church of Los Angeles), THE     | **JUDGMENT, TO QUIET TITLE, TO**
   | AFRICAN METHODIST EPISCOPAL ZION         | **IMPOSE A CONSTRUCTIVE TRUST,**
20 | CHURCH, an unincorporated association    | **AND UNJUST ENRICHMENT**
   | headquartered in North Carolina,
21
   |          Plaintiffs,
22
   |     v.
23
   | AME ZION WESTERN EPISCOPAL
24 | DISTRICT, a California corporation,
   | JEFFREY SCOTT BLEECKER, as trustee for
25 | THE BLEECKER FAMILY TRUST, LANCE
   | EVIC, LISA MOTES, CHICAGO TITLE
26 | COMPANY, as Trustee,
27 |          Defendants.
28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

                                                          Case No. 20-23726-A

1    The religious denomination known as The African Methodist Episcopal Zion Church

2  ("**Denomination**") and one of its local congregations, First AME Zion Church of Los Angeles

3  (formally incorporated in 1905 as "African Methodist Episcopal Zion Church") ("**First AME**

4  **Zion**"), as Plaintiffs in the above-captioned adversary proceeding, by and through their attorneys,

5  respectfully submit this complaint ("**Complaint**") against the above-captioned Defendants (the

6  "Defendants"), and, upon knowledge of their own acts and upon information and belief as to other

7  matters, allege as follows:

8  **I.**    **SUMMARY OF THE ACTION**

9    1.   The Denomination and First AME Zion bring this adversary proceeding to prevent

10  the unjust and unlawful sale of First AME Zion's longstanding church home, located at 1449 W.

11  Adams Blvd., Los Angeles, California ("**Church Property**"), and to restore record legal title to

12  First AME Zion, free and clear of any interest that the Debtor in this Bankruptcy case, Defendant

13  AME Zion Western Episcopal District ("**Debtor**"), claims to have acquired or that Debtor

14  purportedly conveyed to any of the other parties named as defendants in this adversary proceeding.

15    2.   The Debtor, pretending to be the rightful owner of First AME Zion's property,

16  purported to pledge the Church Property as collateral for two "hard money" loans, the first taken

17  out in December 2017 for $1.2 million, and the second (to "refinance" the first) taken out in April

18  2020 for $1,520,308.60.

19    3.   In fact, however, the Debtor never acquired any ownership interest in the Church

20  Property and had no authority to pledge that property as collateral for any loan.

21    4.   On the contrary, First AME Zion acquired legal title to the Church Property in 1972;

22  has remained in continuous possession and control of the Church Property ever since; and has never

23  transferred the Church Property or any interest therein to the Debtor or to anyone else.

24    5.   In fact, the only instrument that purported to transfer the Church Property to the

25  Debtor was not signed by any officer, director, trustee, or member of First AME Zion, but solely by

26  the *Debtor's* own Chief Executive Officer, Staccato Powell. Specifically, in late December 2017,

27  Powell signed a "Grant Deed" that purported to transfer First AME Zion's property to the Debtor

28  ("**2017 Grant Deed**"). The 2017 Grant Deed is dated December 20, 2017, but the acknowledgement

at the bottom of the 2017 Grant Deed states that Powell actually appeared before a notary in Cobb County, Georgia, on December 26, 2017 to sign the 2017 Grant Deed. The 2017 Grant Deed was recorded with the Los Angeles County Recorder's Office on December 28, 2017 as Document No. 20171513686. A copy of the 2017 Grant Deed is attached hereto as Exhibit "A" and incorporated herein by reference.

6.    Also on December 20, 2017, the Debtor's Chief Financial Officer (Dr. Sheila Quintana) executed a Deed of Trust purporting to pledge the Church Property as security for the Debtor's first loan of $1.2 million ("**2017 Deed of Trust**"). The 2017 Deed of Trust was recorded with the Los Angeles County Recorder's Office on December 28, 2017 as Document No. 20171513687, apparently immediately after the recording of the 2017 Grant Deed. A copy of the 2017 Deed of Trust is attached hereto as Exhibit "B" and incorporated herein by reference.

7.    Taking advantage of the similarity between the Denomination's name and First AME Zion's formal corporate name, Powell identified himself on the 2017 Grant Deed as a "Bishop" of the "African Methodist Episcopal Zion Church," claiming thereby to have the "authorized capacity" to transfer First AME Zion's property to the Debtor. A cursory review of First AME Zion's corporate Statement of Information, however, on file at the time with the California Secretary of State ("**First AME Zion 2017 Statement of Information**"), would have revealed that Bishop Powell was *not* an officer of First AME Zion, the purported "Grantor" in the 2017 Grant Deed, but was instead the CEO of record of the purported "Grantee," the Debtor, as was clearly revealed in the Debtor's own Statement of Information ("Debtor's 2017 Statement of Information").Copies of First AME Zion 2017 Statement of Information and the Debtor's 2017 Statement of Information are attached hereto as Exhibits "C" and "D," respectively, and are incorporated herein by reference.

8.    The 2017 Grant Deed also falsely recites that the Debtor acquired the Church Property "FOR A VALUABLE CONSIDERATION." In truth, First AME Zion received nothing from the Debtor, and certainly no fraction of the loan proceeds the Debtor obtained on the strength of that supposed transfer. Indeed, First AME Zion never learned of the 2017 Grant Deed, let alone that its property had been offered as security for a loan of $1.2 million, until March 2020, when it received notice that the Debtor's lenders planned to foreclose on the Church Property on April 1,

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

3    Case No. 20-23726-A

1    2020, pursuant to the 2017 Deed of Trust.

2        9.    Facing imminent foreclosure, Powell doubled down on his opening gambit. In

3    particular, in April 2020, the Debtor returned to the same cast of hard money lenders and their

4    broker, continuing to claim outright ownership of First AME Zion's property, and based on the

5    value of the very same collateral agreed to "refinance" the first $1.2 million loan—the *principal*

6    balance of which had now *grown* to $1.48 million—with a new loan for $1.52 million, requiring

7    monthly "interest only" payments of $15,203.09 for twelve months, to be followed by a "balloon

8    payment" of the then "entire outstanding principal sum and accrued interest (estimated to be)

9    $1,535,511.69.

10       10.    This second loan did nothing to validate and restore First AME Zion's record legal

11   title to the Church Property. It merely replaced the 2017 Deed of Trust with a new one, dated April

12   5, 2020 ("**2020 Deed of Trust**"), while charging a higher interest rate (12% vs. 10% on the 2017

13   loan) and generating more than $86,000 in new commissions and fees for the lenders and their

14   broker. A copy of the 2020 Deed of Trust is attached hereto as Exhibit "E" and incorporated herein

15   by reference.

16       11.    On July 30, 2020, just a few short months later and facing imminent foreclosure on

17   yet another local AME Zion church property, the Debtor filed this bankruptcy case. Still insisting

18   that it owned the Church Property outright, along with real estate that rightfully belong to eight more

19   AME Zion congregations, the Debtor sought protection under Chapter 11, with the stated aim of

20   resolving acknowledged obligations at least $12.5 million, most of it incurred in a series of twenty-

21   two hard money loans, including the two the Debtor purported to secure with First AME Zion's

22   property.

23       12.    Frankly acknowledging that it has no revenue generating operations of its own, the

24   Debtor's stated plan for reorganizing has been to hire a real estate firm to sell and/or "redevelop"

25   the coopted local church properties, in the hope of generating sales proceeds and other revenue

26   sufficient to satisfy and/or restructure the massive debt incurred by the Debtor alone.

27       13.    Meanwhile, apparently finally skeptical that the Debtor has the wherewithal to satisfy

28   its outstanding obligations, the lenders named as Defendants in this adversary proceeding—Jeffrey

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

4                                    Case No. 20-23726-A

1  Scott Bleecker, as trustee for the Bleecker Family Trust, Lance Evic, and Lisa Motes ("**Lenders**")—

2  have filed a motion for an Order terminating the automatic stay insofar as it applies to First AME

3  Zion's property.

4      14.    If the Lenders' motion is granted, or if the Church Property otherwise continues to

5  be treated as an asset of the Debtor and encumbered to secure obligations the Debtor alone owes to

6  the Lenders, the end result will be that First AME Zion will be driven out of its historic and

7  longstanding place of worship.

8      15.    Against that backdrop, First AME Zion and the Denomination have commenced this

9  adversary proceeding to obtain the following relief:

10      a.    Immediately enjoin all Defendants from taking any steps to market, sell,

11  lease, or redevelop the Church Property.

12      b.    Quiet title to the Church Property, declaring that First AME Zion holds legal

13  title to the Church Property, in trust for the Denomination as a whole.

14      c.    Impose a constructive trust on the Church Property, (i) declaring that any bare

15  record title the Debtor currently holds was not justly obtained and is thus held by Debtor as a

16  constructive trustee for the benefit of First AME Zion and the Denomination, and (ii) compelling

17  the Debtor to take all steps necessary to restore record title to First AME Zion.

18      d.    Declare that the Church Property is not the property of the Debtor's estate.

19      e.    Declare that the Church Property does not secure any of the Debtor's

20  obligations, including the loans made the Defendant Lenders.

21      f.    Permanently enjoin all Defendants from taking any further actions or making

22  any further representations with respect to the Church Property.

23  II.   **PARTIES**

24      16.    First AME Zion is a nonprofit religious corporation, organized and existing under

25  the laws of the State of California, with its principal place of business at 1449 W. Adams Blvd., Los

26  Angeles, California. Incorporated under the name "African Methodist Episcopal Zion Church" in

27  1905, First AME Zion is known in the community and does business as First AME Zion Church of

28  Los Angeles.

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

5     Case No. 20-23726-A

17.     The Denomination is an unincorporated voluntary association, whose members perform ministry throughout the United States and globally. The Denomination maintains headquarters at 3225 Sugar Creek Road, Charlotte, North Carolina 28259.

18.     The Debtor was established as a religious corporation under the laws of the State of California in October 2016. The Debtor currently maintains a principal place of business at 2339 W. Hammer Lane, Suite C, #153, Stockton, California 95209.

19.     Defendants Bleecker Family Trust and Jeffrey Scott Bleecker, as trustee for the Bleecker Family Trust, were 41.66667% participant lenders under the 2017 Deed of Trust and they are 42.8413% lenders under the 2020 Deed of Trust. Upon information and belief, The Bleecker Family Trust and Jeffrey Scott Bleecker, as trustee for The Bleecker Family Trust. Upon information and belief: (a) Defendant Jeffrey Scott Bleecker is a citizen of Colorado, resides at 15 Falcon Way, Durango, CO 81301-4975, and has his principal place of business at 10 Town Plaza, #123, Durango, Colorado 81301; and (b) the mailing address and principal place of business of Defendant Bleecker Family Trust is 10 Town Plaza, #123, Durango, Colorado 81301.

20.     Defendant Lance Evic was a 41.66667% participant lender under the 2017 Deed of Trust and is a 16.3565% lender under the 2020 Deed of Trust. Upon information and belief, Lance Evic is a citizen of Arizona and resides at 2890 N. Fennimore Ave., Tucson, Arizona 85749. Alternatively, Lance Evic is a citizen of California and resides at 3014 Paseo Del Refugio, Santa Barbara, CA 93105-2952.

21.     Defendant Lisa Motes was a 16.66667% participant lender under the 2017 Deed of Trust and is a 40.8022% lender under the 2020 Deed of Trust. Upon information and belief, Lisa Motes is a citizen of Arizona and resides at 2470 N Castle Rock Dr, Tucson, AZ 85749-7916.

22.     The Bleecker Family Trust, Jeffrey Scott Bleecker, as Trustee for The Bleecker Family Trust, Lance Evic, and Lisa Motes are collectively referred to herein as the "**Lenders**."

23.     Defendant Chicago Title Company ("**Chicago Title**") served as Trustee for the Debtor's Lenders under both the 2017 Deed of Trust and the 2020 Deed of Trust. The last known principal place of business for Chicago Title is 2010 Crow Canyon Place, Suite 212, San Ramon, CA 94583.

24.     At all relevant times to this action, each Defendant (i)(a) was an agent, employee, lender, joint venture, partner, servant, surety of, or (b) has aided or assisted, one of the other Defendants in connection with transactions described herein; and (ii) was acting within the scope of said agency, employment, lending relationship, partnership, service, venture, or suretyship, with the knowledge, consent or ratification of at least one of the other Defendants in doing the things alleged in this Complaint.

## III.     JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b) and the General Orders of Reference 182 and 223 from the United States District Court for the Eastern District of California.

26.     This action arises in and relates to the bankruptcy case pending in the United States Bankruptcy Court for the Eastern District of California, Sacramento Division, captioned, *In re AME Zion Western Episcopal District*, Case No. 20-23726.

27.     The Debtor in the above-captioned proceeding under Chapter 11 of the Bankruptcy Code (the "**Case**") is a defendant in this matter.

28.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (K) and (O).

29.     Venue for this Case and this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

30.     Plaintiffs consent to the entry of judgment and final orders by this Bankruptcy Court (the "Court") in accordance with Rule 7008 of the Federal Rules of Bankruptcy Procedure.

31.     This Court has personal jurisdiction over the Defendants pursuant to FRBP 7004(f).

32.     The statutory predicates for the relief requested herein are contained in Sections 105(a), 506, and 541 of the Bankruptcy Code; Bankruptcy Rules 7001(2), 7001(7), 7001(9), and 7065; 28 U.S.C. §§ 2201 and 2202 (the "**Declaratory Judgment Act**"), California Civil Code Sections §§ 2224 and 3412; California Corporations Code § 9142; and California Code of Civil Procedure §§ 760.010 through 760.050, 761.010, 761.020, 762.010, 762.020, and 764.010 through 764.080.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

7      Case No. 20-23726-A

## IV.   FIRST AME ZION'S CHURCH PROPERTY

33.     First AME Zion's property—the Church Property at issue in this adversary proceeding—is located at 1449 W. Adams Blvd., Los Angeles, California 90007.

34.     The legal description for the Church Property is as follows:

> THE WEST HALF OF LOT 7 AND ALL OF THE LOTS 8,9.10, 11. AND 35 OF KENWOOD PARK TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 23, RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY
>
> Also known as: 1449 W Adams Blvd., Los Angeles, CA 90007
> AP#: 5054-027-018

35.     Built in 1930, and sometimes referred to as the "First AME Zion Cathedral," the Cultural Heritage Commission of the City of Los Angeles designated the Church Property as an Historical Cultural Landmark in January 1988, a distinction shared by such nearby landmarks as the Los Angeles Memorial Coliseum (site of the 1932 and 1984 Summer Olympic Games) and the Shrine Auditorium (site of eleven Academy Awards ceremonies between 1947 and 2001).

## V.   STATEMENT OF FACTS

### A.   The African Methodist Episcopal Zion Church: Structure and Governance

36.     The African Methodist Episcopal Zion Church (*i.e.*, the Plaintiff Denomination in this case) is a historically Black denomination whose mother church was founded in New York City in 1796.

37.     Though affiliated at its founding with the Methodist Episcopal Church—a predecessor of today's United Methodist Church—that first AME Zion congregation in New York City became a distinct, autonomous denomination in July 1820. Notably, one of the key grounds for establishing a distinct denomination was the passage of a bill in the New York State legislature 1820 that provided that the "trustees" or "stewards" of Methodist Episcopal congregations in New York would henceforth "hold the property of the [congregation] for the preachers in conference instead of the members of the [congregation]."[1] Viewing this as tantamount to a forced transfer of "our

---

[1] Rev. John J. Moore, "History of The African Methodist Episcopal [Zion] Church," in HISTORY OF

McCORMICK, BARSTOW, SHEPPARO, WAYTE & CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

property . . . into the hands of Methodist preachers in Conference," the members of that first AME Zion congregation resolved to separate from The Methodist Episcopal Church and establish their denomination, even while retaining much of Methodist polity, doctrine, and organizational structure.

38.     The AME Zion denomination today numbers about 1.4 million members and conducts its ministry throughout the United States and globally.

39.     The Denomination is primarily organized into regionally based "Annual Conferences," so named because its members—drawn from the clergy and lay membership of each local congregation within the Annual Conference's jurisdiction—meet once a year to address matters of common concern to the mission and ministry of those congregations and to the clergy that are appointed to serve as their pastors.

40.     Each Annual Conference is presided over by one of the Denomination's bishops.

41.     The various Annual Conferences, in turn, are grouped into twelve geographic areas known as Episcopal Districts. The term "Episcopal" reflects that the Denomination's ministry within each Annual Conference level is overseen by a bishop. An "Episcopal District" is the name used to identify the geographic region that encompasses all of the Annual Conferences over which a single bishop presides.

42.     Annual Conferences, in turn, are subdivided into "Presiding Elder Districts," each of which is supervised by a "Presiding Elder" appointed by the Bishop.

43.     Presiding Elders serve the critical function of being the supervising intermediary between the local church pastor and the Bishop, and between the local church itself and the Annual Conference in which it is located. Presiding Elders are required to meet regularly with the pastor-in-charge of each local church.

44.     In addition, as reflected in the very name of the office, the Presiding Elder is responsible for presiding over a quarterly meeting of the congregation's key lay leaders and all of its clergy. Known as the "Quarterly Conference," this local church body is the chief governing

---

DENOMINATIONS IN THE UNITED STATES (3rd ed. 1852) 401-402.

1  authority in any AME Zion local church. All other local church committees and boards – including

2  the Board of Trustees (which has general responsibility for the church's real property) and the Board

3  of Stewards (which oversees financial matters) – are amenable to and subject to the direction of the

4  Quarterly Conference.

5      45.     In the AME Zion denomination, a local church cannot undertake its most significant

6  actions – including any transfer or encumbering of the church's real property – without first

7  obtaining the approval of the Quarterly Conference.

8      46.     Indeed, as outlined below, any disposition of a local AME Zion's church property is

9  deemed so significant that it must also be approved by a majority vote of the congregation's entire

10  membership and, even then, only with the written consent of the Bishop.

11      47.     The Denomination's supreme legislative body is its General Conference.

12      48.     Comprised of clergy and lay delegates elected by the membership of each Annual

13  Conference, the General Conference convenes once every four years and (for purposes of this

14  proceeding at least) performs two vital functions:

15          a.      The General Conference is responsible for enacting the provisions included

16  in *The Discipline of the AME Zion Church* ("**Discipline**"), which sets forth the laws, plan, polity,

17  and process by which the Denomination governs itself and which is binding on all clergy (including

18  Bishops) and laity at every level of the Denomination.

19          b.      The General Conference elects the Denomination's Bishops and determines

20  which Annual Conferences they will be assigned to oversee.

21      49.     Between quadrennial sessions of the General Conference, the "general supervision"

22  of Denomination is vested in a "Board of Bishops," comprised of all of the Denomination's Bishops.

23      50.     The General Conference elected Staccato Powell to become a Bishop of The African

24  Methodist Episcopal Zion Church on July 23, 2016, and he was formally consecrated as such on

25  July 26, 2016.

26      51.     Powell was assigned to oversee and preside over all Annual Conferences located

27  within the "Western Episcopal District." That region is ***not*** the Debtor corporation Bishop Powell

28  that first established in October 2016, but simply the name the Denomination has long assigned to

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

10          Case No. 20-23726-A

the geographic area that encompasses all AME Zion Annual Conferences that conduct ministry in the states of California, Alaska, Arizona, Colorado, Oregon, and Washington. Five multicultural and racially diverse Annual Conferences are located within those states, including fifty-two local churches that are grouped into eight Presiding Elder Districts.

**B.    The Governing Law of the AME Zion Denomination Regarding the Ownership and Disposition of Local Church Property**

52.    It is a well-settled law of the AME Zion Church that the property of a local church cannot be disposed of or mortgaged outside of the safeguards established by the General Conference and set forth in the *Discipline*. Paragraph 398 of the *Discipline* provides:

> The Trustees shall not in any case whatsoever dispose of church property by sale or otherwise *without the consent of the majority of the members in full connection, expressed by vote in a meeting called for that purpose*, of which due notice has been given. Provided, however, that no congregation, Pastor, nor trustee board or agent of the congregation shall mortgage or sell any property of The A. M. E. Zion Church *without confirmation of the Quarterly Conference* and *written consent of the Bishop of the district or the Annual Conference*.

*Discipline*, ¶ 398 (2016) (emphasis added).

53.    Accordingly, the *Discipline* requires that a four-prong test must be completely satisfied before the property of a local church can be disposed of by sale or otherwise encumbered. The four prongs are as follows:

a.    A meeting must be held by the Board of Trustees of the local church to consider either a transfer or obtaining a mortgage on the respective church's property.

b.    The consent of the majority of the members of the local church "in full connection" must be obtained and such consent must be expressed in a vote at a meeting called for that purpose, of which due notice is given.

c.    The consent, once obtained, must be confirmed at the Quarterly Conference before any property may be transferred or mortgaged.

d.    Prior to any transfer or mortgage of the church's property, the written consent of the Bishop of the Episcopal District must be obtained.

54.    Satisfaction of each of these prongs must be documented and reflected in the minutes and records of the local church, including (without limitation) the minutes approved and resolutions

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

11                    Case No. 20-23726-A

1   adopted by the Quarterly Conference and the related meeting minutes and resolutions of the local

2   church's Board of Trustees, which is the body authorized to execute real estate transactions on the

3   local church's behalf, subject to the approval and direction of the Quarterly Conference. Failure to

4   adhere to these transfer provisions in the *Discipline* nullifies the transfer.

5        55.      Within the *Discipline*, the following provisions are also relevant to AME Zion church

6   properties:

7      All assets owned by an African Methodist Episcopal Zion Church, whether incorporated, unincorporated, or abandoned:

8

9        a.      Shall be held by the trustees of the church *in trust* for the African Methodist Episcopal Zion Church; and

10        b.      *Are subject to The Discipline*, usage, and ministerial appointments of The African Methodist Episcopal Zion Church, as from time to time authorized and declared by the General Conference of said church.

11

12   *Discipline*, ¶ 391.4. (2016) (emphasis added).

13        56.      Finally, all written instruments of conveyance by which the properties are held or

14   thereafter acquired, for use as a place of divine worship for members of the AME Zion Church or

15   for other church activities, must contain the following trust clause (the "**Trust Clause**"):

16      *In trust* that said premises *shall be used, kept maintained,* and disposed of *as a place of divine worship for the use of the ministry, and membership of The African Methodist Episcopal Zion Church in America, subject to the provisions of the Discipline,* usage, and ministerial appointments of said church, as from time to time authorized and declared by the General Conference of said church, and by the Annual Conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserved no right or interest in said premises.

17

18

19

20

21   *Discipline*, ¶ 394 (2016) (emphasis added).

22        **C.**      <u>**First AME Zion Church of Los Angeles**</u>

23        57.      First AME Zion is among the oldest African American congregations in Los

24   Angeles.

25        58.      First AME Zion was incorporated in 1905.

26        59.      First AME Zion acquired legal title to the Church Property pursuant to a Corporation

27   Grant Deed dated November 6, 1972 ("**1972 Grant Deed**"). The 1972 Grant Deed Grant Deed was

28   recorded with the Los Angeles County Recorder's Office on November 22, 1972 as Document No.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

12

Case No. 20-23726-A

1972.1122.0859. A copy of the 1972 Grant Deed is attached hereto as Exhibit "F" and incorporated herein by reference.

60. Consistent with the *Discipline* and longstanding polity in all Methodist denominations, the 1972 Grant Deed expressly provided that First AME Zion was acquiring the Church Property *in trust* for the AME Zion Denomination as a whole and was obliged to hold the property subject to the *Discipline*. Specifically, the 1972 Grant Deed stated that First AME Zion, through its named trustees, received the Church Property,

> *in trust* that said premises shall be used, kept maintained, and disposed of as a place of Divine worship for the use of the Ministry, and Membership of the African Methodist Episcopal Zion Church in America, *subject to the provisions of the Discipline*, Usage, and Ministerial appointments of said Church, as from time to time authorized and declared by the General Conference of said Church, and by the Annual conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee and the grantor reserves no right or interest in said premises.

61. First AME Zion completed a substantial renovation of the Church Property in early 1997, only to have it damaged by a fire in July 1997.

62. Repairs and further renovations of the Church Property were completed in 2000. On April 8, 2000, mindful of the property's historical and architectural significance, the West Adams Heritage Association held its annual General Meeting "at this beautiful landmark church," and in conjunction therewith sponsored an event entitled "A Church Reborn," which included a tour of the newly renovated and lecture by the restoration architect.

63. According to the Office of the Assessor of Los Angeles County the assessed value of the Church Property for the 2020 tax year was $4,229,226, with the land assessed at $2,356,506 and the improvements assessed at $1,872,720.

**D. Bishop Powell's Establishment of the Debtor Corporation and Usurpation of First AME Zion's Property**

64. Bishop Staccato Powell was elected as a Bishop of the Denomination and assigned to preside over the Annual Conference located within the Western Episcopal District.

65. On or about October 28, 2016, Articles of Incorporation were filed with the California Secretary of State establishing the Debtor as a nonprofit religious corporation.

66.     In a Statement of Information filed with the Secretary of State on March 1, 2017—nearly nine full months *before* the Debtor incurred any obligations purportedly secured by the Church Property—the Debtor identified Bishop Powell as its Chief Executive Officer and Sheila Quintana as Chief Financial Officer of the Debtor. Sandra Davis executed that March 2017 Statement of Information on the Debtor's behalf, and in subsequent documents is identified as the Debtor's President and Chair of its variously named "Board of Directors" or "Board of Trustees."

67.     As previously outlined, the record reveals that Bishop Powell, with assistance from Sheila Quintana and Sandra Davis, both undoubtedly acting at Bishop Powell's direction, took steps to coopt and encumber First AME Zion's property.

68.     In late December 2017, Bishop Powell himself executed the 2017 Grant Deed, falsely claiming to possess unilateral authority to transfer First AME Zion's property to the Debtor corporation that Powell had only recently established and controlled.

69.     In contemporaneous transactions, the Debtor's CFO (Sheila Quintana) signed (i) the Note pursuant to which the Debtor borrowed $1.2 million from the Lenders, and (ii) the corresponding 2017 Deed of Trust, in which the Debtor pretended to secure its repayment obligations to the Lenders by purporting to "grant, transfer, set over, convey and assign, to [Chicago Title, as] Trustee, . . . WITH THE POWER OF SALE, and right of entry and possession, . . . [Debtor's supposed] interest" in First AME Zion's historic property.

70.     After defaulting on that initial obligation and promising to comply with the Board of Bishops' demand that all church properties be restored to their rightful owners, Bishop Powell only made matters worse in April 2020, taking out yet another hard money loan, now for even more money ($1.5 million) and at a higher interest rate (12%), with the now elevated obligation still secured entirely by First AME Zion's property and still lacking any plan for generating revenues sufficient to meet this or any other of its ever-mounting obligations.

71.     Not one of these transactions was approved or authorized in the manner required by the *Discipline*.

72.     First AME Zion's Board of Trustee never met to approve and never authorized Bishop Powell or anyone else to transfer or encumber First AME Zion's property.

73.     No meeting of entire membership of First AME Zion's membership was ever convened to approve any of these transactions, with the result that none of those transactions were undertaken with the consent of the majority of First AME Zion's members.

74.     The Presiding Elder never called and convened a Quarterly Conference for the purpose of having that body confirm the transfer or the mortgaging of First AME Zion's property.

75.     The initial loan in 2017 and the 2020 "refinancing" loan were both arranged by a mortgage broker named Church Capital Corporation ("Church Capital"). Church Capital, by its own account, "specialize[s] in commercial loans for churches of all denominations, promising "quick funding" and "easy qualifying," "without a bunch of forms."[2] According to its web site, the "principals at Church Capital Corporation have arranged millions in loans for Churches throughout the United States since 1999."[3]

76.     When the Debtor received the first loan December 2017, Church Capital, the Lenders, and Chicago Title knew or had reason to know of a) the Trust Clause in the 1972 Grant Deed, including the provision that First AME Zion held title subject to the terms of the *Discipline*, and b) that the Church Property did not belong to the Debtor, but to a distinct and active congregation that remained in actual and full and possession of the Church Property throughout this period, that was duly registered as a California corporation, and whose corporate officers—as documented at all relevant times in public records filed with the Secretary of State—did not include the person that executed the 2017 Grant Deed that purported to convey First AME Zion's property to the Debtor.

77.     At the same time, and at all relevant times thereafter, Church Capital, the Lenders, and Chicago Title knew or had reason to know, of numerous reported decisions making clear that ownership and control over local church property in virtually every Methodist denomination, including the AME Zion denomination—including especially the authority to transfer or encumber such property—is not self-evident and is strictly governed by detailed property ownership and

---

[2] CHURCH CAPITAL CORPORATION, http://churchcapital.net/?fbclid=IwAR2k8D2TH6Glh5HCASkTsl-czOUJF4xqARCko_OBTV-co225JPOr6HTFsvQ (last visited March 9, 2021).

[3] *Id.*

1    transfer provisions set forth in each of those denomination's Books of Discipline.

2    78.    On July 27, 2020, after foreclosure notices had been received by other local churches,

3    the Board of Bishops sent a letter to all AME Zion congregations and clergy conducting ministry

4    within the Annual Conferences located within the Western Episcopal District (the "**July 27th**

5    **Letter**").

6    79.    In the July 27th Letter, the Board of Bishops indicated that a number of local church

7    properties had been conveyed to the Debtor without first obtaining the approval of the local church

8    Board of Trustees, the Quarterly Conference, and an officially called Members Meeting. As stated

9    by the Board of Bishops:

10    The procedures used [by Powell] to change local church deeds and convey them to
the Western Episcopal District *did not conform to the process described in the AME*

11    *Zion Discipline*; [and] therefore, it is the position of the Board of Bishops that *all
deeds must be restored to the original language and any deed for church property*

12    *must be consistent with our law.*

13    80.    The July 27th Letter further stated that the Board of Bishops had met with Powell on

14    July 22, 2020, during which Powell promised "to bring this situation to an appropriate resolution."

15    81.    Just four days later, with default notices accumulating and one local church (First

16    AME Zion Church of San Bernardino) already lost to foreclosure, the Debtor sought protection

17    under Chapter 11 of the Bankruptcy Code, with the immediate effect of staying the foreclosure of

18    yet another local church property on July 30, 2020.

19    82.    In reaction to the Debtor's bankruptcy filing, the alarming failure of Powell to deed

20    the properties back to the local churches and the mounting and equally alarming questions regarding

21    the monumental financial obligations apparently incurred by Powell through the Debtor, on August

22    7, 2020, the Board of Bishops relieved Powell of all Episcopal duties.

23    83.    The Right Rev. George D. Crenshaw has now assumed the responsibilities of

24    Presiding Bishop of the Annual Conferences located within the Western Episcopal District, which

25    include all aspects of ecclesiastical and fiscal oversight until the current investigations of the

26    operations of the Western Episcopal District are concluded.

27    84.    It remains a mystery what use the Debtor made of most of the millions in loan

28    proceeds the Debtor obtained by pretending to own the local church properties, and whether Powell

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

16      Case No. 20-23726-A

1    diverted or redirected tithing received from local churches within the Annual Conferences he was

2    charged to oversee in order to service the debt incurred by the Debtor. After Bishop Crenshaw was

3    assigned to preside over those Annual Conferences, any largesse that Powell had afforded himself

4    with respect to any AME Zion assets and funds located in that region was gone and Powell no longer

5    possessed any authority to enter into any transactions regarding any AME property in the Western

6    Episcopal District.

7          85.      After commencing this Case, the Debtor, through Counsel, has represented that it has

8    "a right to sell, refinance, and repurpose . . . the real property" identified in its Schedules as assets

9    of the Debtor (*9/14 Transcript*, pg. 16, ll. 6-8), and the "unfettered right do whatever they want with

10    the[se] propert[ies]" (*Id.*, pg.16, ll. 16-20). In pursuit of that supposed authority, the Debtor later

11    engaged a real estate firm to market various of the local church properties, presumably including

12    the property that rightfully belongs to First AME Zion.

13          86.      In the wake of these continued steps to coopt the sacred worship spaces of the

14    Denomination's own local churches, in derogation of the binding and judicially enforceable

15    provisions set forth in *Discipline*, the denomination entered an appearance in the Bankruptcy Case

16    on November 16, 2020 (Doc 107).

17          87.      On February 10, 2021, the Lenders filed a Motion for Order Terminating Automatic

18    Stay or Requiring Adequate Protection (Doc 159). Citing their status as beneficiaries of the 2020

19    Deed of Trust, the Lenders contend that the Church Property is valued at $2.4 million, which they

20    further assert is inadequate protection. While acknowledging that the property is currently "being

21    used as a church," Doc 159, ¶ 3, the Lenders insist that the "only remedy for this loan to be paid is

22    for the Property to be sold," *id.*, ¶ 8, and accordingly the Lenders "seek relief to complete foreclosure

23    and obtain possession of the Property." *Id.*, ¶ 6.

## FIRST CAUSE OF ACTION

### Section 105 Preliminary and Permanent Injunction

### (Against All Defendants)

27          88.      The Plaintiffs reallege and incorporate by reference all the allegations contained in

28    each of the paragraphs set forth above, as if fully set forth herein.

89. A Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

90. A Bankruptcy Court may, therefore, in its discretion, issue injunctive relief under section 105 of the Bankruptcy Code in order to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to the case before it.

91. The Debtor has represented to this Court that the Church Property is an asset of the Debtor and can be freely sold.

92. The Defendant Lenders have previously sought to foreclose on the Church Property and have a motion pending for relief from the automatic stay, with the aim of selling the Church Property to satisfy the Debtor's obligation to the Lenders.

93. First AME Zion is and remains the rightful owner of the Church Property, having long held legal title thereto, *in trust* for the Denomination and subject to its *Discipline*.

94. From the time First AME Zion first acquired the Church Property in 1972, and still, the Denomination has held an equitable interest in the Church Property pursuant to express trust provisions set forth in the *Discipline*, trust provisions that are binding and judicially enforceable under Cal. Corp. Code § 9142(c)(2) and longstanding precedent of the California and United States Supreme Courts. *See Jones v. Wolf*, 443 U.S. 595, 606 (1979); *In re: Episcopal Church Cases*, 45 Cal.4th 467, 491-92 [198 P.3d 66] (2009).

95. First AME Zion never transferred legal title to or any ownership interest in the Church Property to the Debtor or to any of the other Defendants.

96. First AME Zion never approved the 2017 Deed of Trust, or the 2020 Deed of Trust, or any other attempted mortgaging or encumbering of the Church Property by the Debtor or any of the other Defendants.

97. The Denomination never released its equitable interest in the Church Property. Such a release occurs only when a transfer or encumbrance of local AME Zion church property is accomplished in full compliance with all relevant provisions of the *Discipline*.

98. The purported transfer of the Church Property to the Debtor in December 2017 was never approved in the manner required by the *Discipline*.

99. The purported mortgaging of the Church Property in December 2017 was not accomplished in compliance with the *Discipline*.

100. The purported mortgaging of the Church Property in April 2020 was not accomplished in compliance with the *Discipline*.

101. Any claim of ownership of the Church Property by the Debtor is based solely on the 2017 Grant Deed, which was executed solely by the Chief Executive Officer of the Debtor, the purported Grant*ee* in that instrument, and not by any officer, trustee or member of First AME Zion, the purported Grant*or*.

102. Any marketing, sale, lease, or other disposition of the Church Property by any of the Defendants would cause irreparable harm to First AME Zion and the Denomination.

103. There is no adequate remedy at law for First AME Zion or the Denomination if the Church Property were to be transferred to a third party.

104. Monetary compensation would not adequately compensate First AME Zion or the Denomination for the loss of the Church Property.

105. California law holds that anyone "whose property has been taken from [them] is *not* relegated to a personal claim against the wrongdoer which might have to be shared with other creditors; [they are] given the right to a restoration of the property itself." *Bainbridge v. Stoner*, 16 Cal.2d 423, 428-29 [106 P.2d 423] (1940), *citing* Cal. Civ. Code § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.").

106. In addition to the inherent uniqueness of all real property, the Church Property in particular is both a sacred place of worship for the members of First AME Zion and a Historical Cultural Monument in the City of Los Angeles.

107. The public interest will be served by the issuance of an injunction to bar the marketing and sale of the Church Property in that, among other reasons, such an injunction will reinforce the legal principles, the property ownership rights of a California corporation, and the rights of California citizens to the free exercise of their religion in peaceable possession of their

1    longstanding and historic place of worship and ministry.

2        108.    This Court's issuance of relief enjoining all the Defendants would not harm the

3    Defendants. Alternatively, any such harm is outweighed by the permanent irreparable harm that

4    would be sustained by the Plaintiffs if the relief is denied.

5        109.    Therefore, preliminary and permanent injunctive relief pursuant to section 105 of the

6    Bankruptcy Code, enjoining Defendants from taking any further actions with respect to the Church

7    Property, is necessary and appropriate.

8                     **SECOND CAUSE OF ACTION**

9                        **Declaratory Judgment**

10                     **(Against All Defendants)**

11        110.    The Plaintiffs reallege and incorporate by reference by reference all the allegations

12    contained in each of the paragraphs set forth above, as if fully set forth herein.

13        111.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. §

14    2201 and Bankruptcy Rules 7001(2) and 7001(9).

15        112.    Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within

16    its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

17    of any interested party seeking such declaration, whether or not further relief is or could be sought."

18    28 U.S.C. § 2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue

19    declaratory judgments.

20        113.    Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under

21    all the circumstances, show that there is a substantial controversy, between parties having adverse

22    legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

23    judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

24        114.    The Debtor has listed the Church Property in its schedules as an asset of the estate

25    and the Defendant Lenders have filed a motion for relief from the automatic stay to enforce alleged

26    interests in the Church Property purportedly acquired under the 2017 and 2020 Deeds of Trust.

27    / / /

28    / / /

115.    The Plaintiffs dispute that the Debtor ever acquired any valid interest in the Church Property and equally dispute that the other Defendants have every acquired any valid interest in the Church Property.

116.    Accordingly, there is a substantial controversy between the Plaintiffs and the Defendants regarding ownership of the Church Property.

117.    The declaratory relief sought by the Plaintiffs is warranted for the following reasons:

a.    First AME Zion is and remains the rightful owner of the Church Property, having long held legal title thereto, *in trust* for the Denomination and subject to its *Discipline*.

b.    From the time First AME Zion first acquired the Church Property in 1972, and still, the Denomination has held an equitable interest in the Church Property pursuant to the Trust Clause and the express trust provisions set forth in the *Discipline*, trust provisions that are binding and judicially enforceable under the California Corporations Code and longstanding precedent of the California and United States Supreme Courts.

c.    First AME Zion never transferred legal title to or any ownership interest in the Church Property to the Debtor or to any of the other Defendants.

d.    First AME Zion never approved the 2017 Deed of Trust, or the 2020 Deed of Trust, or any other attempted mortgaging or encumbering of the Church Property by the Debtor or any of the other Defendants.

e.    The Denomination never released its equitable interest in the Church Property. Such a release occurs only when a transfer or encumbrance of local AME Zion church property is accomplished in full compliance with all of the relevant provisions of the *Discipline*.

f.    The purported transfer of the Church Property to the Debtor in December 2017 was never approved in the manner required by the *Discipline*.

g.    The purported mortgaging of the Church Property in December 2017 was not accomplished in compliance with the *Discipline*.

h.    The purported mortgaging of the Church Property in April 2020 was not accomplished in compliance with the *Discipline*.

/ / /

i. Any claim of ownership of the Church Property by the Debtor is based solely on the 2017 Grant Deed. The 2017 Grant Deed, however, did not convey First AME Zion's ownership interest in the Church Property to the Debtor because that deed was executed solely by the Chief Executive Officer of the Debtor, the purported Grant*ee* in that instrument, and not by any officer, trustee or member of First AME Zion, the purported Grant*or*.

j. No interest in the Church Property was conveyed in the 2017 Deed of Trust or the 2020 Deed of Trust because the efficacy of both of those transactions depended on the validity of the 2017 Grant Deed, which is lacking.

k. In addition, at the time the 2017 and 2020 Deeds of Trust were executed, the Lenders, Church Capital, and Chicago Title each knew or had reason to know that the Church Property did not belong to the Debtor, but to a distinct and active congregation that remained in actual and full possession and control of the Church Property throughout this period, that was duly registered as a California corporation, and whose corporate officers—as documented in public records filed with the Secretary of State—did not include the person that executed the 2017 Grant Deed that purported to convey First AME Zion's property to the Debtor.

l. At the same time, and at all relevant times thereafter, Church Capital, the Lenders, and Chicago Title also knew or had reason to know of numerous reported decisions making clear that ownership, control and the authority to convey local church property in many religious denominations, including AME Zion and virtually every other historically Methodist denomination, is strictly governed by detailed property ownership and transfer provisions set forth in each of those denomination's governing documents, such as the *Discipline*.

118. It is both necessary and appropriate for the Court to issue a declaratory judgment affirming that (i) the 2017 Grant Deed is void; (ii) the 2017 Deed of Trust and the 2020 Deed of Trust are both void insofar as they purported to pledge the Church Property or any interest therein as security for any obligation of the Debtor; (iii) First AME Zion remains the holder of legal title to the Church Property and continues to hold that property *in trust* for the Denomination, subject to the express trust and all related property provisions set forth in the *Discipline*; (iv) record legal title to the Church Property must be restored to First AME Zion; (v) none of the Defendants has any

1  cognizable interest in the Church Property; and (vi) the Church Property does not qualify as property

2  of the Debtor's estate under Bankruptcy Code § 541.

3  **THIRD CAUSE OF ACTION**

4  **Quiet Title**

5  **(Against All Defendants)**

6      119.    The Plaintiffs reallege and incorporate by reference by reference all the allegations

7  contained in each of the paragraphs set forth above, as if fully set forth herein.

8      120.    The claims herein involve First AME Zion's rights, title, and interest in and to the

9  Church Property.

10     121.    First AME Zion is the owner of the Church Property and has never authorized,

11 agreed, permitted, or consented to any sale, encumbrance, pledge as collateral or other form of lien

12 or claim to title on the Church Property.

13     122.    The basis of First AME Zion's title is as follows:

14          a.      First AME Zion has been both in possession of and held title to the Church

15 Property at all times since First AME Zion first acquired the property in 1972.

16          b.      From the time First AME Zion first acquired the Church Property in 1972,

17 and still, the Denomination has held an equitable interest in the Church Property pursuant to the

18 Trust Clause and the express trust provisions set forth in the *Discipline*, trust provisions that are

19 binding and judicially enforceable under the California Corporate Code and longstanding precedent

20 of the California and United States Supreme Courts.

21          c.      First AME Zion never transferred legal title to or any ownership interest in

22 the Church Property to the Debtor or to any of the other Defendants.

23          d.      First AME Zion never approved the 2017 Deed of Trust, or the 2020 Deed of

24 Trust, or any other attempted mortgaging or encumbering of the Church Property by the Debtor or

25 any of the other Defendants.

26 / / /

27 / / /

28 / / /

e.　　　The Denomination never released its equitable interest in the Church Property. Such a release occurs only when a transfer or encumbrance of local AME Zion church property is accomplished in full compliance with all of the following relevant provisions of the *Discipline*.

f.　　　The purported transfer of the Church Property to the Debtor in December 2017 was never approved in the manner required by the *Discipline*.

g.　　　The purported mortgaging of the Church Property in December 2017 was not accomplished in compliance with the *Discipline*.

h.　　　The purported mortgaging of the Church Property in April 2020 was not accomplished in compliance with the *Discipline*.

i.　　　Any claim of ownership of the Church Property by the Debtor is based solely on the 2017 Grant Deed. The 2017 Grant Deed, however, did not convey First AME Zion's ownership interest in the Church Property to the Debtor because that deed was executed solely by the Chief Executive Officer of the Debtor, the purported Grant*ee* in that instrument, and not by any officer, trustee or member of First AME Zion, the purported Grant*or*.

j.　　　No interest in the Church Property was conveyed in the 2017 Deed of Trust or the 2020 Deed of Trust because the efficacy of both of those transactions depended on the validity of the 2017 Grant Deed, which is lacking.

k.　　　In addition, at the time the 2017 and 2020 Deeds of Trust were executed, the Lenders, Church Capital, and Chicago Title each knew or had reason to know i) of the Trust Clause in the 1972 Grant Deed, including the provision that First AME Zion held title subject to the terms of the *Discipline*, and ii) that the Church Property did not belong to the Debtor, but to a distinct and active congregation that remained in actual and full possession and control of the Church Property throughout this period, that was duly registered as a California corporation, and whose corporate officers—as documented in public records filed with the Secretary of State—did not include the person that executed the 2017 Grant Deed that purported to convey First AME Zion's property to the Debtor.

/ / /

l.     At the same time, and at all relevant times thereafter, Church Capital, the Lenders, and Chicago Title also knew or had reason to know of numerous reported decisions making clear that ownership, control and the authority to convey local church property in many religious denominations, including AME Zion and virtually every other historically Methodist denomination, is strictly governed by detailed property ownership and transfer provisions set forth in each of those denomination's governing documents, such as the *Discipline*.

123.     First AME Zion and the Denomination respectfully request that all claims, encumbrances, liens, and clouds against the title to the Church Property be quieted in favor of First AME Zion and against the claims of all the Defendants.

124.     First AME Zion also respectfully requests that, in order to avoid violating the automatic stay, the requirement that a notice of *lis pendens* be filed in compliance with California Civil Procedure Section 761.010 be waived or, alternatively, with leave of the Court, that either (i) the filing of this action be deemed to effect such notice or (ii) the stay be modified to allow First AME Zion to file the same as required by California Civil Procedure Section 761.010.

### FOURTH CAUSE OF ACTION

### Imposition of a Constructive Trust

### (Against All Defendants)

125.     The Plaintiffs reallege and incorporate by reference by reference all the allegations contained in each of the paragraphs set forth above, as if fully set forth herein.

126.     California Civil Code § 2224 provides, "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

127.     Thus, California has codified the theory of a "constructive trust," which "was adopted by equity as a remedy to compel one to restore property to which he is not justly entitled, to another," when the "person holding the property . . . acquired it through fraud, undue influence, breach of trust, or in any other improper manner . . . ." *Bainbridge v. Stoner*, 16 Cal.2d 423, 428 [106 P.2d 423] (1940).

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

25                      Case No. 20-23726-A

128. California law further holds that, in such cases, the party "whose property has been taken from [them] is not relegated to a personal claim against the wrongdoer which might have to be shared with other creditors; [rather, they are] given the right to a restoration of the property itself." *Id.*, 16 Cal.2d at 428-29.

129. Finally, when assets declared by a debtor in Bankruptcy are determined to be subject to a constructive trust, those assets should be excluded from the debtor's estate and restored to the beneficiary of the constructive trust. *See In re Unicom Computer Corp.*, 13 F.3d 321 (9th Cir. 1994); *see also In re Golden Triangle Capital, Inc.*, 171 B.R. 79, 81-82 (B.A.P. 9th Cir. 1994).

130. Insofar the Debtor is currently identified owner ***of record*** of legal title to the Church Property, the Debtor acquired such "title" in an improper and dishonest manner, in that its Chief Executive Officer executed the 2017 Grant Deed without the knowledge of First AME Zion, and thereby either (A) misrepresented himself as an officer of First AME Zion, or (B) pretended, contrary to the *Discipline's* terms, that Bishops of The African Methodist Episcopal Zion Church have unilateral authority to convey and encumber the property of AME Zion's local congregations.

131. For these reasons, and otherwise under the circumstances alleged herein, the Plaintiffs respectfully request that the Court (i) impose a constructive trust on the Church Property; (ii) declare that, as a result, the Church Property should be excluded from the Debtor's estate and restored to First AME Zion free and clear of any encumbrances in favor of Defendants.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

### (Against The Debtor)

132. The Plaintiffs reallege and incorporate by reference all the allegations contained in each of the paragraphs set forth above, as if fully set forth herein.

133. A party is unjustly enriched when it retains a benefit to the detriment of another party against the fundamental principles of justice, equity, and good conscience.

134. The Debtor has reaped benefit from the Debtor's wrongful conduct. That the Debtor would retain such a benefit to the detriment of First AME Zion and the Denomination violates the fundamental principles of justice, equity, and good conscience.

135. The only effective means of preventing further unjust enrichment of the Debtor, and irreparable harm to the Plaintiffs, is to require the Debtor to relinquish all title to or interest in the Church Property, fully restoring record legal title to First AME Zion, in trust for the Denomination free and clear of all liens and encumbrances.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against the Defendants:

A. Preliminarily enjoining all Defendants from taking any further actions to encumber, market, sell, or otherwise transfer the Church Property while this Court determines title to the Church Property.

B. Permanently enjoining all Defendants and all other persons claiming under them from asserting any claim of title or interest in the Church Property adverse to the title of First AME Zion and the equitable interest of the Denomination.

C. Declaring that (i) the 2017 Grant Deed is void; (ii) the 2017 Deed of Trust and the 2020 Deed of Trust are both void insofar as they purported to pledge the Church Property or any interest therein as security for any obligation of the Debtor; (iii) First AME Zion remains the holder of legal title to the Church Property and continues to hold that property *in trust* for the Denomination, subject to the Trust Clause and all related property provisions set forth in the *Discipline*; (iv) record legal title to the Church Property must be restored to First AME Zion; (v) none of the Defendants has any cognizable interest in the Church Property; and (vi) the Church Property does not qualify as property of the Debtor's estate under Bankruptcy Code § 541.

D. Restoring all of First AME Zion's right, title, and interest in the Church Property by quieting title, voiding, and extinguishing all claims, encumbrances, and security interests that any Defendant purports to hold, real or implied, as a claim against the Church Property.

E. Waiving the requirement that a notice of *lis pendens* be filed in compliance with California Civil Procedure Section 761.010, deeming that the commencement of this action has effected such notice or, alternatively, allowing the automatic stay to be modified to allow First AME Zion to file the *lis pendens*, as required under California Civil Procedure Section 761.010.

F.      Imposing a constructive trust on the Church Property and, as a result, directing that the Church Property is excluded from the Debtor's estate and record legal title thereto restored to First AME Zion.

G.      Directing each of the Defendants to relinquish any title to or interest in the Church Property.

H.      Awarding such other, further, and different relief as the Court deems equitable, just, and proper.

Dated: March 10, 2021

                     McCORMICK, BARSTOW, SHEPPARD,
                     WAYTE & CARRUTH LLP

By:          /s/ Hagop T. Bedoyan
                     Hagop T. Bedoyan
                     Shane G. Smith
                     Matthew P. Bunting
                     Attorneys for Plaintiffs

7478546.1

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
7647 NORTH FRESNO STREET
FRESNO, CA 93720

28            Case No. 20-23726-A

# EXHIBIT "A"

**2017 Grant Deed Document No. 20171513686**

**This page is part of your document - DO NOT DISCARD**



## 20171513686



**Pages:**
**0002**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**12/28/17 AT 08:00AM**

| | |
|---|---|
| FEES: | 42.00 |
| TAXES: | 6,720.00 |
| OTHER: | 0.00 |
| PAID: | 6,762.00 |

### PCOR SURCHARGE $20.00



**L E A D S H E E T**



201712281020039

**00014715999**



008815027

**SEQ:**
**01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**



E466443

**RECORDING REQUESTED BY:**
Chicago Title Company

**AND WHEN RECORDED MAIL TO:**

AME Western Episcopal District
2339 Hammer Lane
Stockton, CA 95209

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: FSJP-3071700731 | Escrow No.: 019025-KL |
|---|---|

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
**DOCUMENTARY TRANSFER TAX is COUNTY $1,320.00 CITY: $5,400.00**

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area    [X]  City of Los Angeles **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**African Methodist Episcopal Zion Church**

hereby GRANT(s) to:

**AME Zion Western Episcopal District, a California Religious Corporation**

the real property in the City of Los Angeles, County of Los Angeles, State of California, described as:

THE WEST HALF OF LOT 7 AND ALL OF THE LOTS 8,9,10, 11, AND 35 OF KENWOOD PARK TRACT, IN THE CITY OF LOS ANGELES COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 23, RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

Also Known as:  1449 W Adams Blvd., Los Angeles, CA  90007
AP#: 5054-027-018
Dated December 20, 2017                           African Methodist Episcopal Zion Church

Staccato Powell, Bishop

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF Georgia Fulton
COUNTY OF
On 12-26-2017 before me, Enide Panier A Notary Public personally
appeared Staccato Powell who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _Enide Panier_

(Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE

# EXHIBIT "B"

**Grant Deed Document No. 20171513687**

039570-000000 7478293.1

**This page is part of your document - DO NOT DISCARD**



## 20171513687





**Pages:
0020**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**12/28/17 AT 08:00AM**

| | |
|---|---:|
| FEES: | 133.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 133.00 |



**L E A D S H E E T**



201712281020039

**00014716000**



008815027

**SEQ:
02**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**


FSJP-3071700101

RECORDING REQUESTED BY
**CHICAGO TITLE COMPANY**
FSJP-3017106731
RECORDING REQUESTED BY:
CHURCH CAPITAL CORPORATION

WHEN RECORDED MAIL TO:

JEFFREY SCOTT BLEECKER
8987 E TANQUE VERDE RD STE. 309-274
TUCSON AZ 85749

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Loan No.: CCC-1047

### DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

(THIS DOCUMENT IS A FIXTURE FILING IN ACCORDANCE
WITH SECTION 9102 OF THE CALIFORNIA CIVIL CODE)

This DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this **"Deed of Trust"**) is made as of December 19, 2017 by AME Zion Western Episcopal District, a California religious corporation, as Trustor (**"Borrower"**), whose mailing address 2339 Hammer Lane, Stockton, CA 95209.

To Chicago Title Company, (**"Trustee"**), whose mailing address is 2010 Crow Canyon Place, Suite 212, San Ramon, CA 94583, for the benefit of Jeffrey Scott Bleeker, as Trustee of the Bleeker Family Trust, as to an undivided 41.66667% interest; Lance Evic, a married man sole and separate. as to an undivided 41.66667% interest; Lisa Motes, an unmarried woman, as to an undivided 16.66667% interest (**"Lender"**), whose mailing address is JEFFREY SCOTT BLEECKER 8987 E TANQUE VERDE RD STE. 309-274 TUCSON AZ 85749.

### RECITALS

A. Lender has agreed, subject to the terms and conditions of certain Escrow Instructions dated as of December 19, 2017, by and between Borrower and Lender (the "**Loan Agreement**"), to make a loan (the "**Loan**") to Borrower. The Loan is evidenced by that certain Promissory Note executed by Borrower, as Maker, in favor of Lender, as Holder, dated as of December 19, 2017, in the original principal amount of One million Two hundred thousand exactly dollars ($1,200,000.00) (which note, together with all notes issued in substitution or exchange therefore and all amendments thereto, is hereinafter referred to as the ("**Note**"), providing for monthly payments as set forth in the Note, with the balance thereof, due and payable on 01/01/2021. (Said date, any later date to which the maturity date may be extended in accordance with the Note, or any earlier date on which the entire unpaid principal amount shall be paid or required to be paid in full, whether by prepayment, acceleration or otherwise is hereinafter called the "**Maturity Date**". The terms and provisions of the Escrow Instructions and Note are hereby incorporated by reference in this Deed of Trust.

B. Lender desires to secure

(i) the prompt payment of the Note, together with all interest, premiums, and other amounts, if any, due in accordance with the terms of the Note. as well as the prompt payment of any additional indebtedness accruing to Lender on account of any future payments, advances or expenditures made by Lender pursuant to the Note, the Escrow Instructions, Assignment of Leases and Rents of even date herewith (the "**Assignment of Leases**") executed by Borrower in favor of Lender in connection with the Loan, this Deed of Trust or any other agreement, document, or instrument securing the payment of the indebtedness evidenced by the Note (such documents together with any modifications, renewals, extensions or replacements thereof, are hereinafter collectively referred to as (the "**Loan Documents**");

(ii) the prompt performance of each and every covenant, condition, and agreement contained in the Loan Documents; and

(iii) the payment of any and all other debts, claims, obligations, demands, monies, liabilities and indebtedness of any kind or nature now or hereafter owing, arising, due or payable from Borrower, when the document evidencing the same specifically recites the recording information appearing on this Deed of Trust and that it is intended to be secured hereby. Liability for and payment of "Unsecured Environmental Costs". (defined in Section 20(h) below) shall not be secured by this Deed of Trust. All payment obligations of Borrower to Lender are hereinafter sometimes collectively referred to as (the "**Indebtedness**") and all other obligations of Borrower to Lender are hereinafter sometimes collectively referred to as (the "**Obligations**").

**NOW, THEREFORE, TO SECURE** the repayment of the Indebtedness and the performance of the Obligations, Borrower has executed this Deed of Trust and does hereby irrevocably grant, transfer, set over, convey and assign, to Trustee, **IN TRUST, WITH THE POWER OF SALE**. and right of entry and possession, under and subject to the terms and conditions hereof, for the benefit and security of Lender. Borrower's interest in all of the following described property and all proceeds thereof (which property is

hereinafter sometimes collectively referred to as the **"Property"**):

    **A.** The real estate described as follows: SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR COMPLETE LEGAL DESCRIPTION (the "**Land**"); Property commonly known as: 1449 W. Addams, Los Angeles, CA 90007
**B.** All of the following (collectively, the "**Improvements**"): all buildings, improvements and fixtures of every kind or nature situated on the Land; to the extent not owned by tenants of the Property, all machinery, appliances, equipment, and all other personal property of every kind or nature attached to, or used or to be used in connection with the Land, buildings, structures, improvements or fixtures; all building materials and goods procured for use or in connection with the foregoing; and all additions, substitutions and replacements to any of the foregoing;

    **C.** To the extent assignable, all plans, specifications, architectural renderings, drawings, soil test reports, or other reports of examination or analysis of the Land or the Improvements;

    **D.** All easements, rights-of-way, water courses, water rights, air rights and appurtenances in any way belonging, relating or appertaining to any of the Land or Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto ("Appurtenances");

    **E.** To the extent not absolutely assigned in the Assignment of Leases, all agreements affecting the use, enjoyment or occupancy of the Land and/or Improvements now or hereafter entered into (the "**Leases**") and all rents, prepayments, termination payments, royalties, profits, issues and revenues from the Land and/or Improvements from time to time accruing under the Leases (the "**Rents**"), reserving to Borrower, however, so long as no "Event of Default" [hereinafter defined] has occurred hereunder, a revocable license to receive and apply the Rents in accordance with the terms and conditions of Section 12 of this Deed of Trust;

    **F.** All claims, demands, judgments, insurance proceeds, tax refunds, rights of action. Awards of damages, compensation, and settlements hereafter made resulting from or relating to
        (i) the taking of the Land or Improvements or any part thereof under the power of eminent domain,
        (ii) any damage (whether caused by such taking, by casualty or otherwise) to the Land, Improvements or Appurtenances or any part thereof, or
        (iii) the ownership or operation of the Property;

    **G.** To the extent assignable, all management contracts, permits, certificates, licenses, approvals, contracts, entitlements and authorizations, however characterized, issued or in any way furnished for the acquisition, construction, development, operation and use of the Land, Improvements and/or Leases, including building permits, environmental certificates, licenses, certificates of operation, warranties and guaranties;

    **H.** All accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, goods, equipment and all books and records relating to the foregoing;

    **I.** Any monies on deposit with or for the benefit of Lender, including deposits for the payment of real estate taxes;

    **J.** All refunds, rebates, reimbursements, reserves, deferred payments, deposits, cost savings, governmental subsidy payments, governmentally-registered credits (such as emissions reduction credits), other credits, waivers and payments, whether in cash or in kind, due from or payable by
        (i) any federal, state, municipal or other governmental or quasi-governmental agency, authority or district (a "**Governmental Agency**" or
        (ii) any insurance or utility company relating to any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property;

    **K.** All refunds, rebates, reimbursements, credits and payments of any kind due from or payable by any Governmental Agency for any taxes, special taxes, assessments, or similar governmental or quasi-governmental charges or levies imposed upon Borrower with respect to the Property or upon any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property; and

    **L.** All proceeds, products, replacements, additions, substitutions, renewals and accessions of and to the Land, Improvements or Appurtenances or any other property of the types described in the preceding granting clauses; and

    **M.** Any and all after-acquired right, title or interest of Borrower in and to any property of the types described in the preceding granting clauses.

**TO HAVE AND TO HOLD** the Property and all parts thereof, together with the rents, issues, profits and proceeds thereof, unto Trustee, its successors, substitutes and assigns, forever, subject, however, to the terms, covenants, and conditions herein. Borrower covenants and agrees with Lender as follows:

1. **Payment of Indebtedness: Performance of Obligations.** Borrower shall promptly pay in U. S. currency when due the Indebtedness and shall promptly perform all Obligations. If any check or other instrument received by Lender as payment is returned to Lender unpaid, Lender may require that any or all subsequent payments be made in the form of (a) cash; (b) money order; (c) cashier's check drawn on an institution whose deposits are insured by a federal agency; or (d) electronic funds transfer, as selected by Lender.

2. **Taxes and Other Obligations.** Borrower shall pay when due, and before any interest, collection fees or penalties shall accrue, all taxes, assessments, fines, impositions and other charges and obligations, which may become a lien on or charge against Property (collectively "**Charges**"). Borrower shall have the right to contest, in good faith by appropriate proceedings, the amount or validity of any such Charges, so long as: (a) Borrower has given prior written notice to Lender of Borrower's intent to so contest or object to any such Charges; (b) such contest stays the enforcement or collection of the Charges or any lien created; and (c) Borrower has obtained an endorsement, in form and substance satisfactory to Lender, to the loan policy of title insurance issued to Lender, or if Borrower has deposited with Lender a bond or other security satisfactory to Lender in the amount determined by Lender to be equal to the Charges alleged to be owed, penalties which may become due and interest which may accrue for the period of the contest.

Should Borrower fail to make any of such payments, Lender may, at its option and at the expense of Borrower, pay the amounts due for the account of Borrower. Upon the request of Lender, Borrower shall immediately furnish to Lender all notices of amounts due and receipts evidencing payment. Borrower shall promptly notify Lender of any lien on all or any part of the Property and shall promptly discharge any unpermitted lien or encumbrance.

3. **Use of Property.** Unless required by applicable law, Borrower shall not permit any material change in the use of any part of the Property from the use existing at the time this Deed of Trust was executed. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

4. **Insurance and Condemnation.**
    (a) **Insurance.**

(i) Borrower shall keep the Improvements insured, and shall maintain general liability coverage and such other coverage reasonably requested by Lender (except for earthquake coverage), by carrier(s), in amounts and in form at all times reasonably satisfactory to Lender, which carrier(s), amounts and form shall not be changed without the prior written consent of Lender. Each policy will contain a standard waiver of subrogation and a replacement cost endorsement and will provide that Lender will receive not less than thirty (30) days prior notice of any cancellation, termination or non-renewal of a policy or any material change, and that Lender will be named under a standard mortgage endorsement as loss payee.

(ii) If Borrower obtains earthquake, flood or any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall name Lender under a standard mortgage endorsement as loss payee and be subject to all of the provisions of this Paragraph 4.

(iii) In case of loss or damage by fire or other casualty, Borrower shall give immediate written notice thereof to the insurance carrier(s) and to Lender. Lender is authorized and empowered, and Borrower hereby irrevocably appoints Lender as its attorney-in-fact (such appointment is coupled with an interest), at its option, to make or file proofs of loss or damage and to settle and adjust any claim under insurance policies which insure against such risks, or to direct Borrower, in writing, to agree with the insurance carrier(s) on the amount to be paid in regard to such loss.

(iv) Provided no Event of Default then exists and Borrower certifies as to same, the net insurance proceeds (after deduction of Lender's reasonable costs and expenses, if any, in collecting the same) shall be made available for the restoration or repair of the Property if, in Lender's reasonable judgment: (a) restoration or repair and the continued operation of the Property is economically feasible; (b) the value of Lender's security is not reduced; (c) Borrower deposits with Lender from time-to-time an amount, in cash, which Lender, in its sole, but reasonable discretion, determines is necessary, in addition to the net insurance proceeds to pay in full the cost of the restoration or repair (Borrower's deposit shall be disbursed prior to any disbursement of insurance proceeds held by Lender). Any excess proceeds remaining after completion of such repair shall be distributed first to Borrower to the extent Borrower has deposited funds with Lender for such repair with the balance applied against the Indebtedness. Notwithstanding the foregoing, it shall be a condition precedent to any disbursement of insurance proceeds held by Lender hereunder that Lender shall have approved (d) all plans and specifications for any proposed repair or restoration, (e) the construction schedule and (f) the architect's and general contractor's contract for all restoration. Lender may establish other conditions it deems reasonably necessary to assure the work is fully completed in a good and workmanlike manner free of all liens or claims by reason thereof, and in compliance with all applicable laws, rules and regulations. At Lender's option, the net insurance proceeds shall be disbursed pursuant to a

construction escrow acceptable to Lender. If an Event of Default then exists, or any of the conditions set forth in clauses (a) through (f) of this **Section 4 (a)(iv)** have not been met or satisfied, the net insurance proceeds shall be applied to the Indebtedness in such order and manner as Lender may elect, whether or not due and payable, with any excess paid to Borrower;

        (v) If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4(a)(iv) shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to borrower requesting payment.

     **(b) Condemnation.**

        (i) Borrower shall within three (3) business days of its receipt of notice thereof, notify Lender of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, and Borrower shall, after consultation with and subject to Lender's approval, appear in and prosecute any such action or proceeding. Upon Borrower's failure to act in accordance with Lender's prior approval, Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower (such appointment as attorney-in-fact is coupled with an interest), to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation or other taking of the Property, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyances in lieu of condemnation are hereby assigned to and shall be paid to Lender in accordance with the provisions of Section 4(b)(ii) below. Lender is authorized (but is under no obligation) to collect any such proceeds.

        (ii) Lender may, in its sole discretion, elect to (a) apply the net proceeds of any condemnation award (after deduction of Lender's reasonable costs and expenses, if any; in collecting the same) in reduction of the Indebtedness in such order and manner as Lender may elect, whether due or not (b) make the proceeds available to Borrower for the restoration or repair of the Property. Any implied covenant in this Deed of Trust restricting the right of Lender to make such an election is waived by Borrower. In addition, Borrower hereby waives the provisions of any law prohibiting Lender from making such an election, including, without limitation, the provisions of the California Code of Civil Procedure commencing with Section 1265.210. If the net proceeds of the condemnation award are made available to Borrower for restoration or repair, the net proceeds of the condemnation award shall be disbursed upon satisfaction of and in accordance with the terms and conditions set forth in the **Section 4(a)(iv)** above.

     **(c) Assignment of Proceeds**. Borrower hereby absolutely and irrevocably assigns to Lender, and authorizes the payor to pay to Lender, the following claims, causes of action, awards, payments and right to payment:

        (i) All awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it; and

        (ii) All other awards, claims and causes of action, arising out of any warranty affecting all or any part of the Property, or for damage or injury to or decrease in value of all or part of the Property or any interest in it; and

        (iii) All proceeds of any insurance policies payable because of damage or loss sustained to all of part of the Property, whether required to the Loan Documents or otherwise maintained by Borrower; and

        (iv) All interest which may accrue on any of the foregoing.

**5. Preservation and Maintenance of Property.** Borrower shall: (a) not commit waste or permit impairment or deterioration of the Property; (b) not abandon the Property; (c) keep the Property in good repair and restore or repair promptly, in a good and workmanlike manner, all or any part of the Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, upon any damage or loss thereto; (d) comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property; (e) provide for management of the Property by a property manager reasonably satisfactory to Lender pursuant to a contract in form and substance reasonably satisfactory to Lender (which property manager may be Borrower itself); and (f) give notice in writing to Lender of and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Property, the security granted by the Loan Documents or the rights or powers of Lender. Neither Borrower nor any tenant or other person shall remove, demolish or alter any Improvement on the Land except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind and upon Lender's written approval which shall not be unreasonably withheld.

6. **Protection of Lender's Security.** If (a) Borrower fails to pay the Indebtedness or to perform the Obligations, (b) any action or proceeding is commenced which affects or could affect the Property or Lender's interest therein, including any loss, damage, cost, expense or liability incurred by Lender with respect to (i) any environmental matters relating to the Property or (ii) the preparation of the commencement or defense of any action or proceeding or any threatened action or proceeding affecting the Loan Documents or the Property, then Lender, at Lender's option, may make such appearances, disburse such sums and take such action as Lender deems necessary, in its sole discretion, to protect the Property or Lender's interest therein, including entry upon the Property to take such actions Lender determines appropriate to preserve, protect or restore the Property. Any amounts disbursed by Lender pursuant to this Section 6 (including attorneys' fees costs and expenses), together with interest thereon at the Note rate from the date of disbursement, shall become additional Indebtedness of Borrower secured by the lien of this Deed of Trust and the other Loan Documents and shall be due and payable on demand. Nothing contained in this Section 6 shall require Lender to incur any expense or take any action hereunder.

7. **Inspection.** Lender and its authorized agents may make or cause to be made reasonable entries upon and inspections of the Property at all reasonable times upon reasonable advance notice, which notice may be given in writing or orally.

8. **Books and Records.** Borrower shall keep and maintain at all times at Borrower's address stated above, or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, correspondence, Leases and other documents affecting the Property. Lender and its designated agents shall have the right to inspect Borrower's books, records, contracts, correspondence, Leases and other documents affecting the Property at all reasonable times. In the event of a foreclosure of this Deed of Trust, all of Borrower's books, records, contracts, correspondence, Leases and other documents maintained in connection with the Property shall be made available to the successful bidder at the foreclosure sale for inspection and copying for a period of not less than three (3) years following said sale.

9. **Tenant Information.** If requested by Lender, Borrower shall furnish to Lender, within twenty (20) days after Lender's request, a rent schedule and any other information available to Borrower concerning the Property, certified as true and complete by Borrower, showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable, the rent paid to date, and the security deposit being held for such tenant. In the event Borrower fails to comply with the requirements set forth above, Lender shall have the right to cause the books and records of Borrower audited by an independent certified public accountant at Borrower's expense.

10. **Environmental Matters.**
   (a) **No Hazardous Materials on Property.** Borrower represents and warrants that, except as specified herein, to the best of its knowledge after all appropriate inquiry, and covenants that there are not, nor will there be, for so long as any of Borrower's Indebtedness remains outstanding, any Hazardous Materials (as defined below) generated, released, stored, buried or deposited over, beneath, in or upon the Property or on or beneath the surface of adjacent property, except as such Hazardous Materials may be used, stored or transported in connection with the permitted uses of the Property and then only to the extent permitted by law after obtaining all necessary permits and licenses therefore; provided, however, Borrower's obligation with respect to parties not within its control (including tenants) shall be to cause the Property to become into compliance with all applicable Hazardous Materials Laws upon discovering a violation of this provision by any such party. "**Hazardous Materials**" shall mean and include any pollutants, flammables, explosives, petroleum (including crude oil) or any fraction thereof, radioactive materials, hazardous wastes, dangerous or toxic substances or related materials, including substances defined as or included in the definition of toxic or hazardous substances, wastes, or materials under any federal, state or local laws, ordinances, regulations or guidelines which relate to pollution, the environment or the protection of public health and safety, or limiting, prohibiting or otherwise regulating the presence, sale, recycling, generation, manufacture, use, transportation, disposal, release, storage, treatment of, or response or exposure to, toxic or hazardous substances, wastes or materials. Such laws, ordinances, regulations and guidelines are hereinafter collectively referred to as the "**Hazardous Materials Laws**".

   (b) **Compliance with Laws.** Borrower shall, and Borrower shall use all commercially reasonable efforts to cause its employees, agents, tenants, contractors and subcontractors of Borrower to keep and maintain the Property in compliance with, and not cause or knowingly permit the Property to be in violation of, any applicable Hazardous Materials Laws. Neither Borrower nor any employees, agents, tenants, contractors or subcontractors of Borrower or any other persons occupying or present on the Property shall use, generate, manufacture, store or dispose of on, under or about the Property or transport to or from the Property any Hazardous Materials, except as such Hazardous Materials as may be used, stored or transported in connection with the permitted uses of the Property and then only to the extent permitted by law after obtaining all necessary permits and licenses therefor; provided, however, Borrower's obligation with respect to parties not within its control (including tenants) shall be to cause the Property to become into compliance with all applicable Hazardous Materials Laws upon discovering a violation of this provision by any such party.

(c) **Hazardous Materials Claims.** Borrower shall immediately advise Lender in writing of:

(i) any notices received by Borrower (whether such notices are from the Environmental Protection Agency, or any other federal, state or local governmental agency or regional office thereof) of the violation or potential violation of any applicable Hazardous Materials Laws occurring on or about the Property

(ii) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened relating to the Property pursuant to any Hazardous Materials Laws;

(iii) all claims made or threatened by any third party against Borrower or the Property relating to damage, contribution, cost recovery compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in clauses (i), (ii) and (iii) above are hereinafter referred to as **"Hazardous Materials Claims"**): and

(iv) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be subject to any Hazardous Materials Claims. Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any Hazardous Materials Claims and Borrower shall pay to Lender, upon demand, all attorneys' and consultants' fees incurred by Lender in connection therewith.

(d) **Indemnity.** Borrower shall be solely responsible for, and shall indemnify, defend and hold harmless Lender, its directors, officers, employees, agents, successors and assigns from and against, any claim, demand. lawsuit, loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, storage, release, threatened release, discharge, disposal or presence of Hazardous Materials on, under or about the Property (whether occurring prior to or during the term of the Loan or otherwise and regardless of by whom caused, whether by Borrower or any predecessor in title or any owner of land adjacent to the Property or any other third party, or any employee, agent, tenant, contractor or subcontractor of Borrower or any predecessor in title or any such agent and owner or any third person) including, without limitation:

(i) claims of third parties (including governmental agencies) for injury or death to any person or for damage or destruction of any property;

(ii) claims for response costs. clean-up costs, costs and expenses of removal and restoration, including fees of attorneys and experts, and costs of determining the existence of Hazardous Materials and reporting same to any governmental agency;

(iii) any and all other claims for expenses or obligations, including attorneys' fees, costs and other expenses;

(iv) any and all penalties threatened, sought or imposed on account of a violation of any Hazardous Materials Laws; and

(v) all fees of any consultants, attorneys and engineering firms retained in connection with monitoring the obligations of Borrower under this Deed of Trust. The foregoing indemnity by Borrower shall not, however, apply to the extent that any such claim, demand, lawsuit, loss, damage, cost, expense or liability is directly or indirectly the result of the intentional act or active negligence of Lender or any of Lender's employees, agents, successors or assigns.

(e) **Removal of Hazardous Materials.** Borrower, at its sole cost and expense, shall, with due care, in a safe manner and in accordance with all applicable laws, detain the spread of, ameliorate and remove from the Property any Hazardous Materials contamination located on or beneath the Property and monitor or cause to be monitored the levels of Hazardous Materials on, under or about the Property or in the ground water to the extent required by and in accordance with the terms and procedures required by any federal, state or local governmental agency having jurisdiction including, without limitation, any Regional Water Quality Control Board and the Environmental Protection Agency.

(f) **Environmental Assessments.** Lender may, in its sole discretion, if it has a reasonable belief to suspect that a violation of the provisions of this Section 10 has occurred, to require Borrower, at its sole cost and expense, to perform or cause to be performed, such studies or assessments of the Property, as Lender may deem necessary or appropriate or desirable, to determine the status of environmental conditions on and about the Property, which studies and assessments shall be for the benefit of Lender and be prepared in accordance with the specifications established by Lender.

(g) **Inspection and Testing.** Borrower hereby confirms the right of Lender (or a receiver appointed by Lender) to enter upon and inspect all or any portion of the Property for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance into, onto, beneath, or from the Property in accordance with Section 2929.5 of the California Civil Code. Such inspections and the tests and studies performed in connection therewith are collectively called the **"Tests and Studies"**. All costs and expenses incurred by Lender pursuant to this Section 10(g) or pursuant to Section 2929.5 of the California Civil Code, including, without limitation, costs of consultants and contractors, costs of repair of any physical injury to the Property normal and customary to the Tests and Studies, court costs and attorneys' fees, whether incurred in litigation or not and whether before or after judgment, shall be payable by Borrower and, to the extent advanced or incurred by Lender, shall be reimbursed to Lender by Borrower upon demand. Any and all of such costs and expenses advanced by Lender, together with interest thereon at the rate then in effect under the Note, shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note.

**11. Covenants.** Borrower covenants with Lender:

(a) To warrant and defend title to the Property against all claims and demands, subject to easements and restrictions currently of record:

(b) To provide Lender with notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's knowledge, threatened against or relating to Borrower or the Property.'

**12. Lease.** Borrower shall not, without Lender's prior written consent, execute, modify, amend, surrender or terminate any Lease other than at market rates and in the ordinary course of business. All Leases executed or renewed after the date hereof, must be approved by Lender prior to the execution thereof by Borrower. Borrower shall not be authorized to enter into any ground lease of the Property without Lender's prior written approval. If Lender consents to any new lease or the renewal of any existing lease, at Lender's request, Borrower shall cause the tenant thereunder to execute a subordination and attornment agreement in form and substance satisfactory to Lender. Notwithstanding the foregoing, Borrower may enter into month to month leases without Lender's prior written consent, provided such leases are terminable and on no more than thirty (30) days' written notice. Lender is authorized to foreclose this Deed of Trust subject to the rights of any tenants of the Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by Borrower to be, a defense to any proceedings instituted by Lender to collect the sums secured hereby or to collect any deficiency remaining unpaid after the foreclosure sale of the Property. Unless otherwise agreed by Lender in writing, all leases and tenancies of the Property executed subsequent to the date hereof, or any part thereof, shall be subordinate and inferior to the lien of this Deed of Trust, except that from time to time Lender may execute and record among the land records of the jurisdiction where this Deed of Trust is recorded, subordination statements with respect to such of said leases as Lender may designate, whereby the leases so designated by Lender will be made superior to the lien of this Deed of Trust. From and after the recordation of such subordination statements, the leases therein referred to shall be superior to the lien of this Deed of Trust and shall not be affected by any foreclosure hereof. All such leases and tenancies shall contain a provision to the effect that the tenant recognizes the right of the Lender to effect such subordination of this Deed of Trust and consents thereto. So long as there shall not have occurred an Event of Default, Borrower shall have the right to collect all Rents, and shall hold the same, in trust, to be applied first to the payment of all impositions, levies, taxes, assessments and other charges upon the Property, second to maintenance of insurance policies upon the Property required hereby, third to the expenses of Property operations, including maintenance and repairs required hereby, fourth to the payment of that portion of the Indebtedness then due and payable, and fifth, the balance, if any, to or as directed by Borrower.

**13. Estoppel Certificate.** Borrower shall within ten (10) days after Lender's request, furnish Lender with a written statement, duly acknowledged, setting forth the sums, according to Borrower's books and records, secured by the Loan Documents and any right of set-off, counterclaim or other defense which exists against such sums and the Obligations.

**14. Transfers of the Property or Beneficial Interest in Borrower; Assumption.** If Borrower shall sell, enter into a contract of sale, lease for a term of more than six (6) years (including options to renew), lease with an option to purchase for any term, or transfer all or any part of the Property or an interest therein, excluding (a) the creation of a lien or encumbrance, subordinate to this Deed of Trust, (b) or a transfer by devise, descent, or by operation of law upon the death of a joint tenant Borrower without Lender's prior written consent, the Lender may, at its option declare the Note and any other obligations secured by this Deed of Trust, together with accrued interest thereon, immediately due and payable, in full. No waiver of the Lender's right to accelerate shall be effective unless it is in writing. If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration. Such notice shall provide a period of not less than thirty (30) days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by Section 20 hereof.

**15. No Additional Liens, Encumbrances or Indebtedness.** Borrower covenants not to execute any mortgage, security agreement, assignment of leases and rents or other agreement granting a lien (except the liens granted to Lender by the Loan Documents) against, or encumbrance on, the Property or take or fail to take any other action which would result in a lien against the Property or the interest of Borrower in the Property without the prior written consent of Lender; provided that Borrower may in good faith, by appropriate proceeding, contest the validity or amount of any asserted lien and, pending such contest, Borrower shall not be deemed to be in default hereunder if Borrower shall first obtain an endorsement, in form and substance satisfactory to Lender, to the loan policy of title insurance issued to Lender insuring over such lien. Notwithstanding any of the foregoing, Borrower shall not be in default hereunder upon the placement, creation or recording of any mechanics' lien or materialmen's lien against the Property ("Mechanics Liens"), provided that Borrower either removes said Mechanics' Liens within sixty (60) days of recordation, or obtains a bond or bonds in the full amount of the Mechanics' Liens within said time period.

## 16. Assignment of Rents and Leases.

(a) **Assignment.** Borrower, for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby assign, convey, and deliver unto Lender:

(i) All of Assignor's right, title and interest in all of the Leases now or hereafter affecting the Land.

(ii) The immediate and continuing right to collect and receive all of the Rents;

(iii) Any and all rights and claims of any kind that Assignor may have now or in the future against any Tenant  To have and to hold the same unto Assignee, its successors and assigns, until termination of this Assignment as hereinafter provided.

(b) **Absolute Assignment.** The parties intend that this Assignment shall be a present, absolute, and unconditional assignment and shall, immediately upon execution, give Assignee the right to collect the Rents and to apply them in payment of the principal, interest and all other sums payable under the Loan Documents. Such assignment and grant shall continue in effect until the Indebtedness is paid in full. Subject to the provisions set forth herein and provided Borrower has not defaulted in the performance of the terms, covenants, or provisions of the Loan Documents or this Assignment, Borrower grants to Lender a license to enforce the Leases and collect the Rents as they become due. Borrower shall deliver such other Rents to Lender as are necessary for the payment of principal, interest and other sums payable under the Loan Documents as such sums become due. Borrower further agrees that Lender may enforce this Assignment without first resorting' to or exhausting any security or collateral for the Loan; however, nothing herein contained shall prevent Lender from exercising any other right under any of the Loan Documents.

(c) **Power of Attorney.** Borrower hereby irrevocably appoints Lender its true and lawful attorney-in-fact, with full power of substitution and with full power for Lender in its own name and capacity or in the name and capacity of Borrower to demand and collect any and all Rents and to file any claim or take any other action or proceeding and make any settlement regarding the Leases; provided however, Lender shall not exercise such power of attorney unless and until Borrower is in default of any payment or in breach of any material term or provision under the Loan Documents. All Tenants are hereby expressly authorized and directed to pay to Lender, or to such nominee as Lender may designate in writing delivered to such Tenants, all amounts due Borrower pursuant to the Leases. All Tenants are expressly relieved of all duty, liability or obligation to Borrower in respect of all payments so made to Assignee or such nominee

(d) **Indemnity.** Borrower hereby agrees to indemnify Lender and to hold Lender harmless from any liability, loss or damage including without limitation, reasonable attorneys' fees, costs and expenses which may or might be incurred by Lender under the Leases or by reason of this Assignment, and from any and all claims and demands which may be asserted against Lender by reason of any terms, covenant or agreement contained in any of the Leases, other than as a result of Lender's active negligence or willful misconduct.

(e) **Performance of Lease Covenants.** Lender may, at its option, perform any Lease covenant for and on behalf of Borrower and all monies expended in so doing shall be chargeable to Borrower and added to the outstanding principal balance and shall be immediately due and payable with interest thereon at the Note rate.

(f) **Representations and Warranties.** Borrower represents and warrants and shall be deemed to reaffirm the same upon each disbursement of loan proceeds by Lender to Borrower:

(i) The Leases are in full force and effect and have not been modified;

(ii) There are no defaults, defenses or setoffs of either Landlord, or to the best of Borrower's knowledge, Tenant under the Leases nor is there any fact which, with the giving of notice or lapse of time or both, would constitute a default under the Leases;

(iii) The sole ownership of the entire Landlord's interest in the Leases is vested in Borrower and the Leases have not been otherwise assigned or pledged;

(iv) All Rents due to date have been collected, no Rent has been collected in advance (other than rent paid one month in advance, security deposits or the last months rent), and no Tenant has been granted any Rent concession or inducement whatsoever other than as disclosed to Lender in writing; and

(v) There are no Leases on the Property except those Leases specified by Borrower in the Loan Documents.

(g) **Covenants and Agreements.** Borrower hereby covenants and agrees as follows:

(i) Borrower shall not permit any Rent under any Lease of the Property to be collected more than thirty (30) days in advance of the due date thereof.

(ii) Borrower shall act promptly to enforce all available remedies against any delinquent Tenant to protect the interest of the Landlord under all Leases and to preserve the value of the Property.

(iii) Borrower shall comply with and perform in a complete and timely manner all of its obligations as Landlord under all Leases. Borrower shall give notice to Lender of any material default by Borrower under any Lease or by any Tenant under any non-residential Lease in such time to afford Lender an opportunity to cure any such default prior to the Tenant having any right to terminate the Lease. Borrower shall also provide Lender with notice of the commencement of an action of ejectment or any summary proceedings for dispossession of the Tenant under any of the Leases.

(iv) Borrower shall furnish promptly to Lender the original or certified copies of all Leases now existing or hereafter created. Lender shall have the right to notify any Tenant at any time and from time to time of any provision of the Loan Documents.

(v) Borrower shall not permit any Leases to be made of the Property or existing Leases to be modified, terminated, extended or renewed without the prior written consent of Lender.

    17. **Borrower and Lien Not Released.** Without affecting the liability of Borrower or any other person liable for the payment of the Indebtedness and without affecting the lien or charge of this Deed of Trust as security for the payment of the indebtedness, Lender may from time to time and without notice to any junior lien holder or holder of any right or other interest in and to the Property; (a) release any person so liable; (b) waive or modify any provision of this Deed of Trust or the other Loan Documents or grant other indulgences; (c) release all or any part of the Property; (d) take additional security for any obligation herein mentioned; (e) subordinate the lien or charge of this Deed of Trust; (f) consent to the granting of any easement; or (g) consent to any map or plan of the Property.

    18. **California Commercial Code Security Agreement.**

    **(a)** This Deed of Trust shall constitute a security agreement pursuant to the California Commercial Code for any portion of the Property which, under applicable law may be subject to a security interest pursuant to the California Commercial Code (such portion of the Property is hereinafter called the **"Personal Property"**) and Borrower hereby grants to Lender a security interest in the Personal Property. Any reproduction of this Deed of Trust or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender any financing statements as well as extensions, renewals and amendments thereof, and reproductions of this Deed of Trust in such form as Lender may require to perfect a security interest with respect to the Personal Property. Borrower hereby authorizes and empowers Lender and irrevocably appoints Lender its agent and attorney-in-fact to execute and file, on Borrower's behalf, all financing statements and refilings and continuations thereof as Lender deems necessary or advisable to create, preserve and protect such lien. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements as Lender may reasonably require. Without limitation of the foregoing, if an Event of Default occurs, Lender shall be entitled immediately to exercise all remedies available to it under the California Commercial Code.

    **(b)** Any party to any contract subject to the security interest granted herein shall be entitled to rely on the rights of Lender without the necessity of any further notice or action by Borrower. Lender shall not by reason of this Deed of Trust or the exercise of any right granted hereby be obligated to perform any obligation of Borrower with respect to any portion of the Personal Property nor shall Lender be responsible for any act committed by Borrower, or any breach or failure to perform by Borrower with respect to any portion of the Personal Property.

    **(c)** Borrower shall not, without the prior written consent of Lender, sell, assign, transfer, remove or permit to be removed from the Property any of the Personal Property. So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Property, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property. Any replacement or substituted Personal Property shall be subject to the security interest granted herein.

    **(d)** To the extent permitted by law, Borrower and Lender agree that with respect to all items of Personal Property which are or will become fixtures on the Land, this Deed of Trust, upon recording or registration in the real estate records of the proper office, shall constitute a "fixture filing" within the meaning of Sections 9102 and 9502 of the California Commercial Code. Borrower is the record Owner of the Land.

    **(e)** Without in any way affecting Lender's security interest in the Personal Property, it is expressly understood and agreed as follows:

    (i) Borrower shall, at Borrower's expense, promptly take all actions necessary to obtain all proceeds to which Borrower is entitled in connection with the Personal Property, including, without limitation, the filing of any applications or claims and the prosecution of appeals or litigation, if necessary;

    (ii) Borrower shall direct the payer with regard to any of the Personal Property to remit same directly to Lender when due;

    (iii) Borrower shall forward promptly to Lender (a) all notices and correspondence relating in any manner to the Personal Property, and (b) any proceeds received by Borrower in connection with any of the Personal Property;

    (iv) if an Event of Default has occurred, the proceeds of any of the Personal Property received by Lender shall be applied toward the repayment of the Note, or if an Event of Default has not occurred said proceeds shall be deposited by Borrower with Lender subject to the security interest granted herein and applied from time to time toward the payment of any expenses relating to the Property; and

(v) effective upon the occurrence of an Event of Default, Lender shall be and is irrevocably appointed as Borrower's attorney-in-fact (such power of attorney being deemed to be coupled with an interest) to take all such actions on behalf of Borrower that Lender deems necessary and expedient in order to obtain all proceeds to which Borrower is entitled with respect to any of the Personal Property.

**19. Events of Default.  Acceleration of Indebtedness.**  The occurrence of any one or more of the following events shall constitute an "**Event of Default**". under this Deed of Trust:

(a) Failure of Borrower to pay, on or before ten (10) days of the due date, any of the Indebtedness, including any payment due under the Note; or

(b) Failure of Borrower to strictly comply with Sections 4(a)(i) (insurance), 7 (inspection), 10 (environmental matters), 14 (prohibition on transfers), and 15 (no additional liens) of this Deed of Trust, provided, however, Borrower shall have the following time periods following written notice and demand from Lender or Lender's agent within which to cure the failure to strictly comply: (1) Section 10 - thirty (30) business days to commence to cure and thirty (30) days to complete the cure, unless the cure involves an environmental remediation of the Property, in which case the time period to complete the cure shall be extended so long as Borrower is diligently pursuing the cure; (2) Transfers of interests in Borrower in violation of Section 14 -ten (10) business days; (3) Junior encumbrances against the Property in violation of Section 15 - ten (10) business days; or

(c) A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days of its filing), or a custodian, receiver or trustee for any of the Property is appointed, or Borrower makes an assignment for the benefit of creditors. is adjudged insolvent by any state or federal court of competent jurisdiction, or admits its insolvency or inability to pay its debts as they become due or an attachment or execution is levied against any of the Property; or

(d) The occurrence of a default following applicable notice cure periods under and as defined in any other Loan Document; or

(e) Borrower shall default in the payment of any indebtedness (other than the Indebtedness) and such default is declared and is not cured within the time, if any, specified therefore in any agreement governing the same; or

(f) Any material statement, report or certificate made or delivered to Lender by Borrower or any Principal is not materially true and complete at any time; or

(g) Failure of Borrower, within thirty (30) days after notice and demand, to satisfy each and every Obligation not set forth in the subsections above; provided, however, if such Obligation cannot by its nature be cured within thirty (30) days, and if Borrower commences to cure such failure promptly after written notice thereof and thereafter diligently pursues the curing thereof (and then in all events cures such failure within sixty (60) days after the original notice thereof), Borrower shall not be in default hereunder during such period of diligent curing.

All notices and cure periods described herein shall not be applicable to any event which with the giving of notice, the passage of time or both would constitute an Event of Default, if such event has occurred as of the date on which Lender commences a nonjudicial foreclosure proceeding with respect to another Event or Events of Default. Such event shall constitute an independent Event of Default hereunder. Upon the occurrence of an Event of Default at the option of Lender, the Indebtedness shall become immediately due and payable without notice to Borrower and Lender shall be entitled to all of the rights and remedies provided in the Loan Documents or at law or in equity. Each remedy provided in the Loan Documents is distinct and cumulative to all other rights or remedies under the Loan Documents or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

**20. Entry: Foreclosure.**

(a) **Surrender Possession**. Upon the occurrence or an Event of Default, Borrower, upon demand of Lender, shall forthwith surrender to Lender the actual possession of the Property. or to the extent permitted by Law, Trustee or Lender, or their officers or agents or a receiver appointed by a court of competent jurisdiction, may enter and take possession of all or any part of the Property, and may exclude Borrower and its agents and employees wholly therefrom, and may have joint access with Borrower to the books, papers and accounts of Borrower. if Borrower shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by Lender, Lender, Trustee or such receiver may obtain a judgment or decree conferring on Lender or Trustee or such receiver the right to immediate possession of the Property or requiring the delivery of the Property to Lender, Trustee or such receiver, and Borrower specifically consents to the entry of such judgment or decree. Upon every such entering upon or taking of possession, Lender may hold, store, use, operate, manage and control the Property and conduct the business thereof, and Lender or such receiver may take any action required by applicable law or which Lender or such receiver believes necessary to enforce

compliance with the environmental provisions contained herein or in the other Loan Documents, and negotiate with governmental authorities with respect to the Property's environmental compliance and remedial measures in connection therewith. Lender and such receiver and their representatives shall have no liability for any loss, damage, injury, cost or expense resulting from any action or omission which was taken or omitted in good faith.

(b) **Pursue Remedies.** When the Indebtedness or any part thereof shall become due, whether by acceleration or otherwise, Lender may, either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or by any other appropriate proceeding or remedy to:

(i) enforce payment of the Note or the performance of any term, covenant, condition or agreement of Borrower under any of the Loan Documents,

(ii) foreclose the lien hereof for the Indebtedness or part thereof by power of sale, commencement of action or otherwise, as more particularly described in Section 20(c) below or otherwise and sell the Property as an entirety or otherwise, as Lender may determine; and/or

(iii) pursue any other right or remedy available to it under or by the law and decisions of the State in which the Land is located. Notwithstanding any statute or rule of law to the contrary, the failure to join any tenant or tenants of the Property as party defendant or defendants in any foreclosure action or the failure of any such order or judgment to foreclosure their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect (a) the Indebtedness, or any part thereof or (b) any deficiency remaining unpaid after foreclosure and sale of the Property.

(c) **Trustee's Sale.** Should Lender elect to foreclose by exercise of the power of sale contained herein, Lender shall notify Trustee and shall, if required, deposit with Trustee the Note, the original or a certified copy of this Deed of Trust, and such other documents, receipts and evidences of expenditures made and secured hereby as Trustee may require. (i) Upon receipt of such notice from Lender, Trustee shall cause to be recorded and delivered to Borrower such notice of default as may then be required by law and by this Deed of Trust. Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale has been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to the purchaser or purchasers at such sale its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers. (ii) Trustee may postpone the sale of all or any portion of the Property from time to time in accordance with the laws of the State in which the Land is located. (iii) To the fullest extent allowed by law, Borrower hereby expressly waives any right which it may have to direct the order in which any of the Property shall be sold in the event of any sale or sales pursuant to this Deed of Trust.

(d) **Mixed Collateral.** Upon the occurrence of an Event of Default under this Deed of Trust, Lender, pursuant to appropriate statutory provisions, shall have an option to proceed with respect to both the real property portion of the Property and the Personal Property in accordance with its rights, powers and remedies with respect to such real property. Such option shall be revocable by Lender as to all or any portion of the Personal Property at any time prior to the sale of the remainder of the Property. In such event Lender shall designate Trustee to conduct the sale of the Personal Property in combination with the sale of the remainder of the Property. Should Lender elect to sell the Personal Property or any part thereof which is real property or which Lender has elected to treat as real property or which may be sold together with the real property as provided above, Lender or Trustee shall give such notice of default and election to sell as may then be required by law. The parties agree that if Lender shall elect to proceed with respect to any portion of the Personal Property separately from such real property, five (5) days notice of the sale of the Personal Property shall be reasonable notice. The reasonable expenses of retaking, holding, preparing for sale, selling and the like incurred by Lender shall include, but not be limited to, reasonable attorneys' fees, costs and expenses, and other expenses incurred by Lender.

(e) **Rescission of Notice of Sale.** Lender may from time to time rescind any notice of default or notice of sale before any Trustee's sale as provided above in accordance with the laws of the State in which the Land is located. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default to satisfy the obligations of this Deed of Trust, or otherwise affect any provision, covenant, or condition of any Loan Document or any of the rights, obligations or remedies of Trustee or Lender hereunder or thereunder.

(f) **Rights and Remedies Cumulative.** Trustee and Lender shall have all powers, rights and remedies under applicable law whether or not specifically or generally granted or described in this Deed of Trust. Nothing contained herein shall be construed to impair or to restrict such powers, rights and remedies or to preclude any procedures or process otherwise available to trustees or beneficiaries under deeds of trust in the State in which the Land is located. Trustee and Lender, and each of them, shall be entitled to enforce the payment and performance of the Indebtedness or the obligations and to exercise all rights and powers under this Deed of Trust or under any other Loan Document or other agreement of any laws now or hereafter in force, notwithstanding the fact

that some or all of the Indebtedness and the Obligations may now or hereafter be otherwise secured, whether by Deed of Trust, mortgage. pledge, lien, assignment or otherwise. Neither the acceptance of this Deed of Trust nor its enforcement, whether by court action or pursuant to the power of sale or other powers contained herein, shall prejudice or in any manner affect Trustee's or Lender's right to realize upon or enforce any other rights or security now or hereafter held by Trustee and Lender. Trustee and Lender, and each of there, shall be entitled to enforce this Deed of Trust and any other rights or security now or hereafter held by Lender or Trustee in such order and manner as they or either of them may in their absolute discretion determine. No remedy herein conferred upon or reserved to Trustee or Lender is intended to be exclusive of any other remedy contained herein or by law provided or permitted, but each shall to the extent permitted by law be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Every power or remedy given by any of the Loan Documents to Trustee or Lender, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Lender, and either of them may pursue inconsistent remedies. By exercising or by failing to exercise any right, option or election hereunder. Lender shall not be deemed to have waived any provision hereof or to have released Borrower from any of the obligations secured hereby unless such waiver or release is in writing and signed by Lender. The waiver by Lender of Borrower's failure to perform or observe any term, covenant or condition referred to or contained herein to be performed or observed by Borrower shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent failure of Borrower to perform or observe the same or any other such term, covenant or condition referred to or contained herein, and no custom or practice which may develop between Borrower and Lender during the term hereof shall be deemed a waiver of or in any way affect the right of Lender to insist upon the performance by Borrower of the obligations secured hereby in strict accordance with the terms hereof or of any other Loan Document.

(g) **Waiver of Lien.** In accordance with California Code of Civil Procedure Section 726.5, Lender may waive its lien against the Property or any portion thereof, together with fixtures or personal property thereon, to the extent such property is found to be environmentally impaired, and may exercise any and all rights and remedies of an unsecured creditor against Borrower and all of Borrower's assets and property for the recovery of any deficiency, including, without limitation, seeking an attachment order under California Code of Civil Procedure Section 483.010. No such waiver shall be final or binding on Lender unless and until a final money judgment is obtained against Borrower. As between Lender and Borrower, for purposes of California Code of Civil Procedure Section 726.5, Borrower shall have the burden of proving that the release or threatened release was not knowingly or negligently caused or contributed to, or knowingly or willfully permitted or acquiesced to by Borrower or any related party (or any affiliate or agent of Borrower or any related party) and that Borrower made written disclosure of the release to Lender or that Lender otherwise obtained actual knowledge thereof prior to the making of the loan evidenced by the Note. Notwithstanding anything to the contrary contained in this Deed of Trust or the other Loan Documents, Borrower shall be fully and personally liable for all judgments and awards entered against Borrower pursuant to California Code of Civil Procedure 726.5 and such liability shall be an exception to any non-recourse or exculpatory provision in this Deed of Trust or the other Loan Documents and shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Borrower's obligations hereunder shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Property or this Deed of Trust. For the purpose of any action brought under this Section, Borrower hereby waives the defense of laches and any applicable statute of limitations. For purposes of California Code of Civil Procedure 726.5, the acts, knowledge and notice of each "726.5 Party" shall be attributed to and be deemed to have been performed by the party or parties then obligated on and liable for payment of the Note. As used herein, **"726.5 Party"** shall mean Borrower, any successor owner to Borrower of all or any portion of the Property, any related party of Borrower or any such successor and any affiliate or agent of Borrower, any such successor or any such related party.

(h) **Action for Environmental Claims.** In accordance with, and subject to limitations of, California Code of Civil Procedure Section 736, Lender may seek a judgment that Borrower has breached its covenants, representations and/or warranties with respect to the environmental matters contained in Section 10(a) through (g) of this Deed of Trust the (**"Environmental Provisions"**), and may commence and maintain an action or actions in any court of competent jurisdiction for enforcement of the Environmental Provisions and/or recovery of any and all costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other out-of-pocket costs or expenses (including. without limitation, court costs, consultants' fees and attorneys' fees, whether incurred in litigation or not and whether before or after judgment), incurred or advanced by Lender pursuant to the Environmental Provisions (collectively, the **"Environmental Costs"**), excluding, however, any Environmental Costs that are not permitted to be recovered pursuant to Section 736 of the California Code of Civil Procedure. Environmental Costs that are not permitted to be recovered pursuant to Section 736 may be referred to hereinafter as the **"Unsecured Environmental Costs"**, and Environmental Costs other than the Unsecured Environmental Costs may be referred to hereinafter as the **"Secured Environmental Costs"**. Any Unsecured Environmental Costs shall not be secured by this Deed of Trust; however, nothing herein shall prevent Lender from recovering any Unsecured Environmental Costs pursuant to the unsecured Hazardous Materials Indemnity Agreement of even date herewith among Borrower, Lender and certain other parties, to the extent they are recoverable in accordance with said Indemnity Agreement. All Secured Environmental Costs incurred by Lender shall bear interest at the default rate provided under the Note. All secured Environmental Costs together with interest thereon at the rate then in effect under the Note shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note. Borrower acknowledges and agrees that notwithstanding any term or provision contained in this Deed of Trust or in the other Loan Documents, Environmental Costs shall be

exceptions to any nonrecourse or exculpatory provision, if any, and Borrower shall be fully and personally liable for Environmental Costs. Such liability shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Borrower's obligations hereunder shall survive foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Property or this Deed of Trust. For the purposes of any action brought under this subparagraph, Borrower hereby waives the defense of laches and any applicable statute of limitations.

**21. Expenditures and Expenses.** In any action to foreclose the lien hereof or otherwise enforce Lender's rights and remedies hereunder, there shall be allowed and included as additional Indebtedness all expenditures and expenses which may be paid or incurred by or on behalf of Lender including repair costs, payments to remove or protect against liens, attorneys' fees, costs and expenses, receivers' fees, appraisers' fees, engineers' fees, accountants' fees; and any fees, costs and expenses in connection with any Tests and Studies; outlays for documentary and expert evidence, stenographers' charges, stamp taxes, publication costs, and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title searches and examination, title insurance policies, and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute any action or to evidence to bidders at any sale which may be had pursuant to an order or judgment the true condition of the title to, or the value of, the Property. All expenditures and expenses of the nature mentioned in this Section 21 and such costs, expenses and fees as may be incurred or as may be owing by Lender in the protection of the Property and the maintenance of the lien of this Deed of Trust, including the fees, costs and expenses of any attorneys employed by Lender in any litigation or proceeding affecting this Deed of Trust, the Note, the other Loan Documents or the Property; including probate, appellate and bankruptcy proceedings, or in preparations for the commencement or defense of any action or proceeding or threatened action or proceeding, including costs and expenses in connection with obtaining any court order or the appointment of a receiver to enforce Lender's rights pursuant to Section 564 of the California Code of Civil Procedure and/or Section 2929.5 of the California Civil Code, shall be immediately due and payable to Lender, with interest thereon at the default rate set forth in the Note, and shall be secured by this Deed of Trust. In addition to the foregoing award of attorney's fees and costs, Lender shall be entitled to its attorneys' fees and costs incurred in any post-judgment proceedings to collect or enforce any judgment or order relating to this Deed of Trust, the Note secured hereby or the other Loan Documents. This provision is separate and several and shall survive the merger of this provision into any judgment.

**22. Application of Proceeds of Foreclosure Sale.** After deducting all costs, fees and expenses of Trustee and of this Deed of Trust, including, without limitation, costs of evidence of title and actual and customary attorneys' fees of Trustee and Lender in connection with a sale as provided in Section 20(c)(i) above, the proceeds of any foreclosure sale of the Property shall be distributed and applied in the order of priority set forth in the Note with the remainder, if any, to be distributed to the person or persons legally entitled thereto.

**23. Appointment of Receiver.** If an Event of Default is continuing or if Lender shall have accelerated the Indebtedness, Lender upon application to a court of competent jurisdiction, whether in conjunction with Lender's commencement of judicial proceedings to foreclose the lien hereof, or pursuant to other proceedings, shall be entitled as matter of strict right, without notice, and without regard to the occupancy or value of the Property or any other security for the Indebtedness or the insolvency of any party bound for its payment, to the appointment, of a receiver to take possession of and to operate the Property or any portion thereof, and to collect and apply the Rents, and Borrower hereby irrevocably consents to such appointment and waives notice of any application, therefor. In addition, Lender shall have the right to appoint a receiver when permitted under Section 564 of the California Code of Civil Procedure, including, without limitation, in order to enforce Lender's rights under Section 2929.5 of the California Civil Code as described in Section 10(g). The receiver shall have all of the rights and powers to the fullest extent permitted by law. The receiver shall have the right to apply Rents to cleanup, remediation or other response action concerning the release or threatened release of Hazardous Materials, whether or not such actions are pursuant to an order of any federal, state or local governmental agency.

**24. After-Acquired Property.** To the extent permitted by, and subject to, applicable law, the lien of this Deed of Trust, including without limitation the security interest created under the granting clauses of this Deed of Trust, shall automatically attach, without further act, to all property hereafter acquired by Borrower located in or on, or attached to, or used or intended to be used in connection with, or with the operation of, the Property or any part thereof.

**25. Future Advances.** This Deed of Trust is given to secure not only the existing Indebtedness, but also payment and performance of all future advances and other obligations that Borrower or any successor in ownership of all or part of the property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, when a writing evidences the parties' agreement that the advance or obligation be secured by this Deed of Trust.

**26. Trustee Provisions.**

(a)    From time to time upon written request of Lender and presentation of this Deed of Trust for endorsement and without affecting the personal liability of any person for payment of the Indebtedness or performance of the Obligations, Trustee may, without liability therefor and without notice: reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension

agreement or any agreement subordinating the lien or charge hereof. Trustee or Lender may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trusts hereunder and the enforcement of the rights and remedies

(h)        available hereunder, and Trustee or Lender may obtain order or decrees directing or confirming or approving acts in the execution of such trusts and the enforcement of such remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Deed of Trust. Borrower shall pay to Trustee reasonable compensation and reimbursement for services and expenses in the enforcement of the trusts created hereunder, including reasonable attorney's fees. Borrower shall indemnify Trustee and Lender against all losses, claims, demands and liabilities which either may incur, suffer or sustain in the execution of the trusts created hereunder or in the performance of any act required or permitted hereunder or by law.

(c)        From time to time, by a writing signed by Lender, Lender may appoint another trustee to act in the place and stead of Trustee or any successor, with the same effect as if originally named Trustee herein.

**27. Disclosure of Information.** Borrower agrees that Lender shall have the right (but shall be under no obligation) to make available to any party for the purpose of granting participations in or selling, transferring, assigning or conveying all or any part of the Loan (including, without limitation, any governmental agency or authority and any prospective bidder at any foreclosure sale of the Property). any and all information which Lender may have with respect to the Property, whether provided by Borrower or any third party or obtained as a result of any Tests and Studies pursuant to Section 10(g). Borrower agrees that Lender shall have no liability whatsoever as a result of delivering any such information to any third party, and Borrower, on behalf of itself and its successors and assigns (including, without limitation, any purchaser at a foreclosure sale), hereby releases and discharges Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party.

**28. Sale of Loan.** Lender, at any time and without the consent of Borrower, may grant participations in or sell, transfer, assign and convey all or any portion of its right, title and interest in and to the Loan, this Deed of Trust and the other Loan Documents, guaranties given in connection with the Loan and any collateral given to secure the Loan.

**29. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. Lender's acceptance of payment of any sum secured by any of the Loan Documents after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the Indebtedness, nor shall Lender's receipt of any awards, proceeds or damages under Section 4 hereof operate to cure or waive Borrower's default in payment of sums secured by any of the Loan Documents. With respect to all Loan Documents, only waivers made in writing by Lender shall be effective against Lender.

**30. Waiver of Statute of Limitations.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien created by any of the Loan Documents or to any action brought to enforce the Note or any other obligation secured by any of the Loan Documents.

**31. Waiver of Homestead and Redemption.** Borrower hereby waives all right of homestead exemption in the Property. Borrower hereby waives all right of redemption on behalf of Borrower and on behalf of all other persons acquiring any interest or title in the Property subsequent to the date of this Deed of Trust, except decree or judgment creditors of Borrower.

**32. Governing Law; Severability.** This Deed of Trust shall be governed by and construed in accordance with the internal laws of the State of the jurisdiction in which the Land is located. The invalidity, illegality or enforceability of any provision of this Deed of Trust shall not affect or impair the validity, legality or enforceability of the remainder of this Deed of Trust and to this end, the provisions of this Deed of Trust are declared to be severable.

**33. Notice.** Any notice or other communication required or permitted to be given shall be in writing addressed to the respective party at their addresses set forth above and may be personally served, telecopied or sent by overnight courier or U.S. Mail and shall be deemed given: (a) if served in person when served; (b) if telecopied. on the date of transmission; provided that a hard copy of such notice is also sent pursuant to clause (c) or (d) below; (c) if by overnight courier. on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third (3rd) day after deposit in the mail, postage prepaid, certified mail, return receipt requested.

**34. Successors and Assigns Bound; Joint and Several Liability; Agents; Captions.** The covenants and agreements contained in the Loan Documents shall bind, and the rights thereunder shall inure to, the respective successors and assigns of Lender and Borrower subject to the provisions of Section 14 hereof. All covenants and agreements of Borrower shall be joint and several in the event that there is more than one individual or entity comprising Borrower or in the event that Borrower's obligations are succeeded to by one or more successors or assigns. In exercising any rights under the Loan Documents or taking any actions provided for therein, Lender may act through its employees, agents or independent contractors as authorized by Lender. The captions and heading of the paragraphs of this Deed of Trust are for convenience only and not to be used to interpret or define the provisions hereof.

**35. Release.** Upon payment of all sums secured by this Deed of Trust, Lender shall release and reconvey this Deed of Trust. Borrower shall pay Lender's reasonable costs incurred in releasing this Deed of Trust and any financing statements related hereto.

**36. Business Day.** As used in the Loan Documents **"business day"** means any day, other than a Saturday or a Sunday when banks in Los Angeles, California are not required to be closed.

**37. Loss of Note.** Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of indemnity, reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note.

**38. Time of Essence.** Time is of the essence of this Deed of Trust and the performance of each of the covenants and agreements contained herein.

**39. Multiple Lenders.** If the beneficial interests in this Deed of Trust are held by multiple lenders, the Lenders have agreed in writing to be governed by the desires of the holders of more than 50% of the record beneficial interests herein with respect to actions taken on behalf of all holders in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the Broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance or lease of real property owned by holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

**IN WITNESS WHEREOF,** Borrower has executed this Deed of Trust or has caused the same to be executed by its duly authorized representatives as of the date first above written.

AME Zion Western Episcopal District, a California religious corporation

_signature_   12/20/17

Dr. Sheila Quintana, CFO                                              Date

_____     _____
                                                                    Date

(FOR BORROWER NOTARIZATION)

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California) SOLANO <sup>lu</sup>
County of ~~Santa Clara~~    )

On   12-20-17    before me,   PEA MALLARI LEANO.  NOTARY PUBLIC
         Date                                        Here insert Name and Title of the Officer
Personally appeared _____ DR. SHEILA QUINTANA
                                                    Name(s) of signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

**WITNESS my hand and official seal.**

Signature _____
                                Signature of Notary Public

PEA MALLARI LEANO
Notary Public - California
San Mateo County
Commission # 2157650
My Comm. Expires Jun 23, 2020

Place Notary Seal Above

**REQUEST FOR FULL
RECONVEYANCE**

TO Chicago Title Company, TRUSTEE:

The undersigned is the holder of the note or notes secured by this Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing. Said note or notes together **with all other Indebtedness secured by this Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, Security Agreement, Assignment of Leases and Rents And Fixture Filing,** which are delivered hereby and to reconvey, without warranty, all the estate now held by you under this Deed of Trust, Security Agreement, Assignment of Leases and Rents And Fixture Filing to the person or persons legally entitled thereto.

Date: _____

_____
Jeffrey Scott Bleeker, as Trustee of the Bleeker Family Trust, as to an undivided 41.66667% interest

Date: _____

_____
Lance Evic, a married man sole and separate, as to an undivided 41.66667% interest

Date: _____

_____
Lance Evic, a married man sole and separate, as to an undivided 41.66667% interest

**EXHIBIT "A"**
Legal Description

**For APN/Parcel ID(s):  5054-027-018**

The land referred to herein below is situated in the City of Los Angeles, County of Los Angeles, State of California and is described as follows:

The west half of Lot 7 and all of Lots 8, 9, 10, 11 and 35 of Kenwood Park Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in book 23, records in the Office of the county recorder of Said County.

# EXHIBIT "C"

**AME Zion 2017 Statement of Information FH 85225**



# State of California
## Secretary of State

**N**

### Statement of Information
(Domestic Nonprofit, Credit Union and General Cooperative Corporations)

**Filing Fee: $20.00. If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FH85225**

# FILED

**In the office of the Secretary of State of the State of California**

**JAN-05 2017**

---

1. **CORPORATE NAME**

AFRICAN METHODIST EPISCOPAL ZION CHURCH

2. **CALIFORNIA CORPORATE NUMBER**

C0042122

*This Space for Filing Use Only*

---

**Complete Principal Office Address** (Do not abbreviate the name of the city. Item 3 cannot be a P.O. Box.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3. STREET ADDRESS OF PRINCIPAL OFFICE IN CALIFORNIA, IF ANY | | | |
| 1449 W. ADAMS BLVD., LOS ANGELES, CA 90007 | | | |
| 4. MAILING ADDRESS OF THE CORPORATION | | | |
| HUGHEY T. RAY    1449 W. ADAMS BLVD., LOS ANGELES, CA 90007 | | | |

---

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/ | | | | |
| NATHANIEL ANDRADE    1449 W. ADAMS BLVD., LOS ANGELES, CA 90007 | | | | |
| 6. SECRETARY | | | | |
| JOSEPHINE DRAKE    1449 W. ADAMS BLVD., LOS ANGELES, CA 90007 | | | | |
| 7. CHIEF FINANCIAL OFFICER/ | | | | |
| HUGHEY T. RAY    1449 W. ADAMS, LOS ANGELES, CA 90007 | | | | |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 9 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 9 must be left blank.

8. NAME OF AGENT FOR SERVICE OF PROCESS [Note: The person designated as the corporation's agent MUST have agreed to act in that capacity prior to the designation.]

NEVILLE M. TUCKER

9. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL**   CITY   STATE   ZIP CODE

865 S. FIGUEROA ST. SUITE 264C, LOS ANGELES, CA 90007

---

**Common Interest Developments**

10. ☐ Check here if the corporation is an association formed to manage a common interest development under the Davis-Stirling Common Interest Development Act, (California Civil Code section 4000, et seq.) or under the Commercial and Industrial Common Interest Development Act, (California Civil Code section 6500, et seq.). The corporation must file a Statement by Common Interest Development Association (Form SI-CID) as required by California Civil Code sections 5405(a) and 6760(a). Please see instructions on the reverse side of this form.

11. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| 01/05/2017 | HUGHEY T. RAY | STEWARD BD. CHAIR. | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-100 (REV 01/2016) | | APPROVED BY SECRETARY OF STATE |
|---|---|---|

# EXHIBIT "D"

**2017 AME Zion Western Episcopal District**
**Statement of Information FK 13064**



N

# State of California
## Secretary of State

### Statement of Information
(Domestic Nonprofit, Credit Union and General Cooperative Corporations)

**Filing Fee: $20.00. If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

FK13064

# FILED

**In the office of the Secretary of State**
**of the State of California**

**MAR-01 2017**

| 1.  CORPORATE NAME |
|---|
| AME ZION WESTERN EPISCOPAL DISTRICT |

| 2.  CALIFORNIA CORPORATE NUMBER |
|---|
| C3958634 |

This Space for Filing Use Only

**Complete Principal Office Address**  (Do not abbreviate the name of the city. Item 3 cannot be a P.O. Box.)

| 3.  STREET ADDRESS OF PRINCIPAL OFFICE IN CALIFORNIA, IF ANY | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2940 42ND ST, SACRAMENTO, CA 95817 | | | |

| 4.  MAILING ADDRESS OF THE CORPORATION | CITY | STATE | ZIP CODE |
|---|---|---|---|
| SANDRA DAVIS   2339 HAMMER LANE, STOCKTON, CA 95209 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| 5.  CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| STACCATO  POWELL   14541 NEVADA COURT, FONTANA, CA 92336 | | | | |

| 6.  SECRETARY | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| JAWAAD  LOVE   1420 MYRTYLE ST., OAKLAND, CA 94607 | | | | |

| 7.  CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| SHEILA  QUINTANA    653 BRITANNIA DRIVE, VALLEJO, CA 94591 | | | | |

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 9 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 9 must be left blank.

| 8.  NAME OF AGENT FOR SERVICE OF PROCESS   [Note: The person designated as the corporation's agent MUST have agreed to act in that capacity prior to the designation.] |
|---|
| MARCIA  MEREDITH |

| 9.  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2444 E DEL MAR BLVD, PASADENA, CA 91107 | | | |

**Common Interest Developments**

10. ☐ Check here if the corporation is an association formed to manage a common interest development under the Davis-Stirling Common Interest Development Act, (California Civil Code section 4000, et seq.) or under the Commercial and Industrial Common Interest Development Act, (California Civil Code section 6500, et seq.).  The corporation must file a Statement by Common Interest Development Association (Form SI-CID) as required by California Civil Code sections 5405(a) and 6760(a).  Please see instructions on the reverse side of this form.

11.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| 03/01/2017 | SANDRA K. DAVIS | DR. | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-100 (REV 01/2016) | | APPROVED BY SECRETARY OF STATE |
|---|---|---|

# EXHIBIT "E"
**April 5, 2020 Deed of Trust**



This page is part of your document - DO NOT DISCARD

## 20200428656





**Pages:**
**0020**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**04/17/20 AT 08:00AM**

| | |
|---|---|
| FEES: | 141.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 216.00 |



**LEADSHEET**



202004170250014

00019144387



010684162

**SEQ:**
**02**

SECURE - 8:00AM



THIS FORM IS NOT TO BE DUPLICATED      FSJP-3072000

RECORDING REQUESTED BY
   Chicago Title Company #FSJP-3072000141
AND WHEN RECORDED MAIL DOCUMENT TO:

NAME Jeffrey Scott Blecker

STREET ADDRESS 10 Town Plaza #123

CITY, STATE & ZIP CODE Durango, CO 81301

SPACE ABOVE FOR RECORDER'S USE ONLY

Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing

Title of Document

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

☐ Exempt from the fee per GC 27388.1 (a) (2); This document is subject to Documentary Transfer Tax

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer subject to the imposition of documentary transfer tax (DTT).

☐ Exempt from fee per GC 27388.1 (a) (2); recorded concurrently "in connection with" a transfer of real property that is a residential dwelling to an owner-occupier.

☒ Exempt from fee per GC 27388.1 (a) (1); fee cap of $225.00 reached.

☐ Exempt from the fee per GC 27388.1 (a) (1); not related to real property.

☐ Exempt from the fee per GC 27388.1 (a) (1); executed or recorded by the federal government in accordance with The Uniform Federal Lien Registration Act (Title 7(commencing with Section 2100) of Part 4 of the Code of Civil Procedure).

☐ Exempt from the fee per GC 27388.1 (a) (1); executed or recorded by the state or any county, municipality, or other political subdivision of the state.

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

RECORDING REQUESTED BY:
Bleecker Family Trust

WHEN RECORDED MAIL TO:

JEFFREY SCOTT BLEECKER
10 Town Plaza #123 Durango, Co 81301

Loan No.: AME 14490420                          SPACE ABOVE THIS LINE FOR RECORDER'S USE

## DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES
## AND RENTS AND FIXTURE FILING

### (THIS DOCUMENT IS A FIXTURE FILING IN ACCORDANCE
### WITH SECTION 9102 OF THE CALIFORNIA CIVIL CODE)

This DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this "Deed of Trust") is made as of April 5, 2020 by AME Zion Western Episcopal District, a California religious corporation, as Trustor ("Borrower"), whose mailing address 2339 Hammer Lane, Stockton, CA 95209.

To Chicago Title Company, ("Trustee"), whose mailing address is 2010 Crow Canyon Place, Suite 212, San Ramon, CA 94583, for the benefit of Jeffrey Scott Bleecker, as Trustee of the Bleecker Family Trust, as to an undivided 42.8413% interest; Lance Evic, a married man sole and separate, as to an undivided 16.3565% interest; Lisa Motes, an unmarried woman, as to an undivided 40.8022% interest ("Lender"), whose mailing address is JEFFREY SCOTT BLEECKER 10 Town Plaza #123 Durango, CO 81301.

## RECITALS

A. Lender has agreed, subject to the terms and conditions of certain Escrow Instructions dated as of April 5, 2020, by and between Borrower and Lender (the "Loan Agreement"), to make a loan (the "Loan") to Borrower. The Loan is evidenced by that certain Promissory Note executed by Borrower, as Maker, in favor of Lender, as Holder, dated as of April 5, 2020, in the original principal amount of One million Five hundred Twenty thousand Three hundred Eight and 60/100ths dollars ($1,520,308.60) (which note, together with all notes issued in substitution or exchange therefore and all amendments thereto, is hereinafter referred to as the ("Note"), providing for monthly payments as set forth in the Note, with the balance thereof, due and payable on 05/01/2021. (Said date, any later date to which the maturity date may be extended in accordance with the Note, or any earlier date on which the entire unpaid principal amount shall be paid or required to be paid in full, whether by prepayment, acceleration or otherwise is hereinafter called the "Maturity Date". The terms and provisions of the Escrow Instructions and Note are hereby incorporated by reference in this Deed of Trust.

B. Lender desires to secure

(i) the prompt payment of the Note, together with all interest, premiums, and other amounts, if any, due in accordance with the terms of the Note, as well as the prompt payment of any additional indebtedness accruing to Lender on account of any future payments, advances or expenditures made by Lender pursuant to the Note, the Escrow Instructions, Assignment of Leases and Rents of even date herewith (the "Assignment of Leases") executed by Borrower in favor of Lender in connection with the Loan, this Deed of Trust or any other agreement, document, or instrument securing the payment of the indebtedness evidenced by the Note (such documents together with any modifications, renewals, extensions or replacements thereof, are hereinafter collectively referred to as (the "Loan Documents");

(ii) the prompt performance of each and every covenant, condition, and agreement contained in the Loan Documents; and

(iii) the payment of any and all other debts, claims, obligations, demands, monies, liabilities and indebtedness of any kind or nature now or hereafter owing, arising, due or payable from Borrower, when the document evidencing the same specifically recites the recording information appearing on this Deed of Trust and that it is intended to be secured hereby, Liability for and payment of "Unsecured Environmental Costs". (defined in Section 20(h) below) shall not be secured by this Deed of Trust. All payment obligations of Borrower to Lender are hereinafter sometimes collectively referred to as (the "Indebtedness") and all other obligations of Borrower to Lender are hereinafter sometimes collectively referred to as (the "Obligations").

NOW, THEREFORE, TO SECURE the repayment of the Indebtedness and the performance of the Obligations, Borrower has executed this Deed of Trust and does hereby irrevocably grant, transfer, set over, convey and assign, to Trustee, IN TRUST, WITH THE POWER OF SALE, and right of entry and possession, under and subject to the terms and conditions hereof, for the benefit and security of Lender, Borrower's interest in all of the following described property and all proceeds thereof (which property is

hereinafter sometimes collectively referred to as the "Property"):

Page 1 of 18

A. The real estate described as follows: SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF FOR COMPLETE LEGAL DESCRIPTION (the "**Land**"); Property commonly known as: 1449 W. Adams, Los Angeles, CA 90007

B. All of the following (collectively, the "**Improvements**"); all buildings, improvements and fixtures of every kind or nature situated on the Land; to the extent not owned by tenants of the Property, all machinery, appliances, equipment, and all other personal property of every kind or nature attached to, or used or to be used in connection with the Land, buildings, structures, improvements or fixtures; all building materials and goods procured for use or in connection with the foregoing; and all additions, substitutions and replacements to any of the foregoing;

C. To the extent assignable, all plans, specifications, architectural renderings, drawings, soil test reports, or other reports of examination or analysis of the Land or the Improvements;

D. All easements, rights-of-way, water courses, water rights, air rights and appurtenances in any way belonging, relating or appertaining to any of the Land or Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto ("Appurtenances");

E. To the extent not absolutely assigned in the Assignment of Leases, all agreements affecting the use, enjoyment or occupancy of the Land and/or Improvements now or hereafter entered into (the "**Leases**") and all rents, prepayments, termination payments, royalties, profits, issues and revenues from the Land and/or Improvements from time to time accruing under the Leases (the "**Rents**"), reserving to Borrower, however, so long as no "Event of Default" [hereinafter defined] has occurred hereunder, a revocable license to receive and apply the Rents in accordance with the terms and conditions of Section 12 of this Deed of Trust;

F. All claims, demands, judgments, insurance proceeds, tax refunds, rights of action, Awards of damages, compensation, and settlements hereafter made resulting from or relating to

          (i) the taking of the Land or Improvements or any part thereof under the power of eminent domain,

          (ii) any damage (whether caused by such taking, by casualty or otherwise) to the Land, Improvements or Appurtenances or any part thereof, or

          (iii) the ownership or operation of the Property;

G. To the extent assignable, all management contracts, permits, certificates, licenses, approvals, contracts, entitlements and authorizations, however characterized, issued or in any way furnished for the acquisition, construction, development, operation and use of the Land, Improvements and/or Leases, including building permits, environmental certificates, licenses, certificates of operation, warranties and guaranties;

H. All accounts, contract rights, general intangibles, chattel paper, documents, instruments, inventory, goods, equipment and all books and records relating to the foregoing;

I. Any monies on deposit with or for the benefit of Lender, including deposits for the payment of real estate taxes;

J. All refunds, rebates, reimbursements, reserves, deferred payments, deposits, cost savings, governmental subsidy payments, governmentally-registered credits (such as emissions reduction credits), other credits, waivers and payments, whether in cash or in kind, due from or payable by

          (i) any federal, state, municipal or other governmental or quasi-governmental agency, authority or district (a "Governmental Agency" or

          (ii) any insurance or utility company relating to any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property;

K. All refunds, rebates, reimbursements, credits and payments of any kind due from or payable by any Governmental Agency for any taxes, special taxes, assessments, or similar governmental or quasi-governmental charges or levies imposed upon Borrower with respect to the Property or upon any or all of the Property or arising out of the satisfaction of any conditions imposed upon or the obtaining of any approvals for the development or rehabilitation of the Property; and

L. All proceeds, products, replacements, additions, substitutions, renewals and accessions of and to the Land, Improvements or Appurtenances or any other property of the types described in the preceding granting clauses; and

**1. Payment of Indebtedness; Performance of Obligations.** Borrower shall promptly pay in U. S. currency when due the Indebtedness and shall promptly perform all Obligations. If any check or other instrument received by Lender as payment is returned to Lender unpaid, Lender may require that any or all subsequent payments be made in the form of (a) cash; (b) money order; (c) cashier's check drawn on an institution whose deposits are insured by a federal agency; or (d) electronic funds transfer, as selected by Lender.

**2. Taxes and Other Obligations.** Borrower shall pay when due, and before any interest, collection fees or penalties shall accrue, all taxes, assessments, fines, impositions and other charges and obligations, which may become a lien on or charge against Property (collectively "Charges"). Borrower shall have the right to contest, in good faith by appropriate proceedings, the amount or validity of any such Charges, so long as: (a) Borrower has given prior written notice to Lender of Borrower's intent to so contest or object to any such Charges; (b) such contest stays the enforcement or collection of the Charges or any lien created; and (c) Borrower has obtained an endorsement, in form and substance satisfactory to Lender, to the loan policy of title insurance issued to Lender, or if Borrower has deposited with Lender a bond or other security satisfactory to Lender in the amount determined by Lender to be equal to the Charges alleged to be owed, penalties which may become due and interest which may accrue for the period of the contest.

Should Borrower fail to make any of such payments, Lender may, at its option and at the expense of Borrower, pay the amounts due for the account of Borrower. Upon the request of Lender, Borrower shall immediately furnish to Lender all notices of amounts due and receipts evidencing payment. Borrower shall promptly notify Lender of any lien on all or any part of the Property and shall promptly discharge any unpermitted lien or encumbrance.

**3. Use of Property.** Unless required by applicable law, Borrower shall not permit any material change in the use of any part of the Property from the use existing at the time this Deed of Trust was executed. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

**4. Insurance and Condemnation.**
    (a) **Insurance.**

        (i) Borrower shall keep the Improvements insured, and shall maintain general liability coverage and such other coverage reasonably requested by Lender (except for earthquake coverage), by carrier(s), in amounts and in form at all times reasonably satisfactory to Lender, which carrier(s), amounts and form shall not be changed without the prior written consent of Lender. Each policy will contain a standard waiver of subrogation and a replacement cost endorsement and will provide that Lender will receive not less than thirty (30) days prior notice of any cancellation, termination or non-renewal of a policy or any material change, and that Lender will be named under a standard mortgage endorsement as loss payee.

        (ii) If Borrower obtains earthquake, flood or any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall name Lender under a standard mortgage endorsement as loss payee and be subject to all of the provisions of this Paragraph 4.

        (iii) In case of loss or damage by fire or other casualty, Borrower shall give immediate written notice thereof to the insurance carrier(s) and to Lender. Lender is authorized and empowered, and Borrower hereby irrevocably appoints Lender as its attorney-in-fact (such appointment is coupled with an interest), at its option, to make or file proofs of loss or damage and to settle and adjust any claim under insurance policies which insure against such risks, or to direct Borrower, in writing, to agree with the insurance carrier(s) on the amount to be paid in regard to such loss.

        (iv) Provided no Event of Default then exists and Borrower certifies as to same, the net insurance proceeds (after deduction of Lender's reasonable costs and expenses, if any, in collecting the same) shall be made available for the restoration or repair of the Property if, in Lender's reasonable judgment: (a) restoration or repair and the continued operation of the Property is economically feasible; (b) the value of Lender's security is not reduced; (c) Borrower deposits with Lender from time-to-time an amount, in cash, which Lender, in its sole, but reasonable discretion, determines is necessary, in addition to the net insurance proceeds to pay in full the cost of the restoration or repair (Borrower's deposit shall be disbursed prior to any disbursement of insurance proceeds held by Lender). Any excess proceeds remaining after completion of such repair shall be distributed first to Borrower to the extent Borrower has deposited funds with Lender for such repair with the balance applied against the Indebtedness. Notwithstanding the foregoing, it shall be a condition precedent to any disbursement of insurance proceeds held by Lender hereunder that Lender shall have approved (d) all plans and specifications for any proposed repair or restoration, (e) the construction schedule and (f) the architect's and general contractor's contract for all restoration. Lender may establish other conditions it deems reasonably necessary to assure the work is fully completed in a good and workmanlike manner free of all liens or claims by reason thereof, and in compliance with all applicable laws, rules and regulations. At Lender's option, the net insurance proceeds shall be disbursed pursuant to a

construction escrow acceptable to Lender. If an Event of Default then exists, or any of the conditions set forth in clauses (a) through (f) of this **Section 4 (a)(iv)** have not been met or satisfied, the net insurance proceeds shall be applied to the Indebtedness in such order and manner as Lender may elect, whether or not due and payable, with any excess paid to Borrower;

(v) If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4(a)(Iv) shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to borrower requesting payment.

(b) <u>Condemnation.</u>

(i) Borrower shall within three (3) business days of its receipt of notice thereof, notify Lender of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, and Borrower shall, after consultation with and subject to Lender's approval, appear in and prosecute any such action or proceeding. Upon Borrower's failure to act in accordance with Lender's prior approval, Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower (such appointment as attorney-in-fact is coupled with an interest), to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation or other taking of the Property, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyances in lieu of condemnation are hereby assigned to and shall be paid to Lender in accordance with the provisions of Section 4(b)(ii) below. Lender is authorized (but is under no obligation) to collect any such proceeds.

(ii) Lender may, in its sole discretion, elect to (a) apply the net proceeds of any condemnation award (after deduction of Lender's reasonable costs and expenses, if any, in collecting the same) in reduction of the Indebtedness in such order and manner as Lender may elect, whether due or not (b) make the proceeds available to Borrower for the restoration or repair of the Property. Any implied covenant in this Deed of Trust restricting the right of Lender to make such an election is waived by Borrower. In addition, Borrower hereby waives the provisions of any law prohibiting Lender from making such an election, including, without limitation, the provisions of the California Code of Civil Procedure commencing with Section 1265.210. If the net proceeds of the condemnation award are made available to Borrower for restoration or repair, the net proceeds of the condemnation award shall be disbursed upon satisfaction of and in accordance with the terms and conditions set forth in the **Section 4(a)(Iv)** above.

(c) <u>Assignment of Proceeds.</u> Borrower hereby absolutely and irrevocably assigns to Lender, and authorizes the payor to pay to Lender, the following claims, causes of action, awards, payments and right to payment:

(i) All awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it; and

(ii) All other awards, claims and causes of action, arising out of any warranty affecting all or any part of the Property, or for damage or injury to or decrease in value of all or part of the Property or any interest in it; and

(iii) All proceeds of any insurance policies payable because of damage or loss sustained to all of part of the Property, whether required to the Loan Documents or otherwise maintained by Borrower; **and**

(iv) All interest which may accrue on any of the foregoing.

5. <u>Preservation and Maintenance of Property.</u> Borrower shall: (a) not commit waste or permit impairment or deterioration of the Property; (b) not abandon the Property; (c) keep the Property in good repair and restore or repair promptly, in a good and workmanlike manner, all or any part of the Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, upon any damage or loss thereto; (d) comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property; (e) provide for management of the Property by a property manager reasonably satisfactory to Lender pursuant to a contract in form and substance reasonably satisfactory to Lender (which property manager may be Borrower itself); and (f) give notice in writing to Lender of and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Property, the security granted by the Loan Documents or the rights or powers of Lender. Neither Borrower nor any tenant or other person shall remove, demolish or alter any Improvement on the Land except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind and upon Lender's written approval which shall not be unreasonably withheld.

**6. Protection of Lender's Security.** If (a) Borrower fails to pay the Indebtedness or to perform the Obligations, (b) any action or proceeding is commenced which affects or could affect the Property or Lender's interest therein, including any loss, damage, cost, expense or liability incurred by Lender with respect to (i) any environmental matters relating to the Property or (ii) the preparation of the commencement or defense of any action or proceeding or any threatened action or proceeding affecting the Loan Documents or the Property, then Lender, at Lender's option, may make such appearances, disburse such sums and take such action as Lender deems necessary, in its sole discretion, to protect the Property or Lender's interest therein, including entry upon the Property to take such actions Lender determines appropriate to preserve, protect or restore the Property. Any amounts disbursed by Lender pursuant to this Section 6 (including attorneys' fees costs and expenses), together with interest thereon at the Note rate from the date of disbursement, shall become additional Indebtedness of Borrower secured by the lien of this Deed of Trust and the other Loan Documents and shall be due and payable on demand. Nothing contained in this Section 6 shall require Lender to incur any expense or take any action hereunder.

**7. Inspection.** Lender and its authorized agents may make or cause to be made reasonable entries upon and inspections of the Property at all reasonable times upon reasonable advance notice, which notice may be given in writing or orally.

**8. Books and Records.** Borrower shall keep and maintain at all times at Borrower's address stated above, or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, correspondence, Leases and other documents affecting the Property. Lender and its designated agents shall have the right to inspect Borrower's books, records, contracts, correspondence, Leases and other documents affecting the Property at all reasonable times. In the event of a foreclosure of this Deed of Trust, all of Borrower's books, records, contracts, correspondence, Leases and other documents maintained in connection with the Property shall be made available to the successful bidder at the foreclosure sale for inspection and copying for a period of not less than three (3) years following said sale.

**9. Tenant Information.** If requested by Lender, Borrower shall furnish to Lender, within twenty (20) days after Lender's request, a rent schedule and any other information available to Borrower concerning the Property, certified as true and complete by Borrower, showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable, the rent paid to date, and the security deposit being held for such tenant. In the event Borrower fails to comply with the requirements set forth above, Lender shall have the right to cause the books and records of Borrower audited by an independent certified public accountant at Borrower's expense.

**10. Environmental Matters.**

    **(a) No Hazardous Materials on Property.** Borrower represents and warrants that, except as specified herein, to the best of its knowledge after all appropriate inquiry, and covenants that there are not, nor will there be, for so long as any of Borrower's Indebtedness remains outstanding, any Hazardous Materials (as defined below) generated, released, stored, buried or deposited over, beneath, in or upon the Property or on or beneath the surface of adjacent property, except as such Hazardous Materials may be used, stored or transported in connection with the permitted uses of the Property and then only to the extent permitted by law after obtaining all necessary permits and licenses therefore; provided, however, Borrower's obligation with respect to parties not within its control (including tenants) shall be to cause the Property to become into compliance with all applicable Hazardous Materials Laws upon discovering a violation of this provision by any such party. **"Hazardous Materials"** shall mean and include any pollutants, flammables, explosives, petroleum (including crude oil) or any fraction thereof, radioactive materials, hazardous wastes, dangerous or toxic substances or related materials, including substances defined as or included in the definition of toxic or hazardous substances, wastes, or materials under any federal, state or local laws, ordinances, regulations or guidelines which relate to pollution, the environment or the protection of public health and safety, or limiting, prohibiting or otherwise regulating the presence, sale, recycling, generation, manufacture, use, transportation, disposal, release, storage, treatment of, or response or exposure to, toxic or hazardous substances, wastes or materials. Such laws, ordinances, regulations and guidelines are hereinafter collectively referred to as the **"Hazardous Materials Laws"**.

    **(b) Compliance with Laws.** Borrower shall, and Borrower shall use all commercially reasonable efforts to cause its employees, agents, tenants, contractors and subcontractors of Borrower to keep and maintain the Property in compliance with, and not cause or knowingly permit the Property to be in violation of, any applicable Hazardous Materials Laws. Neither Borrower nor any employees, agents, tenants, contractors or subcontractors of Borrower or any other persons occupying or present on the Property shall use, generate, manufacture, store or dispose of on, under or about the Property or transport to or from the Property any Hazardous Materials, except as such Hazardous Materials as may be used, stored or transported in connection with the permitted uses of the Property and then only to the extent permitted by law after obtaining all necessary permits and licenses therefor; provided, however, Borrower's obligation with respect to parties not within its control (including tenants) shall be to cause the Property to become into compliance with all applicable Hazardous Materials Laws upon discovering a violation of this provision by any such party.

(c) **Hazardous Materials Claims.** Borrower shall immediately advise Lender in writing of:

(i) any notices received by Borrower (whether such notices are from the Environmental Protection Agency, or any other federal, state or local governmental agency or regional office thereof) of the violation or potential violation of any applicable Hazardous Materials Laws occurring on or about the Property

(ii) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened relating to the Property pursuant to any Hazardous Materials Laws;

(iii) all claims made or threatened by any third party against Borrower or the Property relating to damage, contribution, cost recovery compensation, loss or injury resulting from any Hazardous Materials (the matters set forth in clauses (i), (ii) and (iii) above are hereinafter referred to as "**Hazardous Materials Claims**"); and

(iv) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be subject to any Hazardous Materials Claims. Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any legal proceedings or actions initiated in connection with any Hazardous Materials Claims and Borrower shall pay to Lender, upon demand, all attorneys' and consultants' fees incurred by Lender in connection therewith.

(d) **Indemnity.** Borrower shall be solely responsible for, and shall indemnify, defend and hold harmless Lender, its directors, officers, employees, agents, successors and assigns from and against, any claim, demand, lawsuit, loss, damage, cost, expense or liability directly or indirectly arising out of or attributable to the use, generation, storage, release, threatened release, discharge, disposal or presence of Hazardous Materials on, under or about the Property (whether occurring prior to or during the term of the Loan or otherwise and regardless of by whom caused, whether by Borrower or any predecessor in title or any owner of land adjacent to the Property or any other third party, or any employee, agent, tenant, contractor or subcontractor of Borrower or any predecessor in title or any such adjacent land owner or any third person) including, without limitation:

(i) claims of third parties (including governmental agencies) for injury or death to any person or for damage or destruction of any property;

(ii) claims for response costs, clean-up costs, costs and expenses of removal and restoration, including fees of attorneys and experts, and costs of determining the existence of Hazardous Materials and reporting same to any governmental agency;

(iii) any and all other claims for expenses or obligations, including attorneys' fees, costs and other expenses;

(iv) any and all penalties threatened, sought or imposed on account of a violation of any Hazardous Materials Laws; and

(v) all fees of any consultants, attorneys and engineering firms retained in connection with monitoring the obligations of Borrower under this Deed of Trust. The foregoing indemnity by Borrower shall not, however, apply to the extent that any such claim, demand, lawsuit, loss, damage, cost, expense or liability is directly or indirectly the result of the intentional act or active negligence of Lender or any of Lender's employees, agents, successors or assigns.

(e) **Removal of Hazardous Materials.** Borrower, at its sole cost and expense, shall, with due care, in a safe manner and in accordance with all applicable laws, detain the spread of, ameliorate and remove from the Property any Hazardous Materials contamination located on or beneath the Property and monitor or cause to be monitored the levels of Hazardous Materials on, under or about the Property or in the ground water to the extent required by and in accordance with the terms and procedures required by any federal, state or local governmental agency having jurisdiction including, without limitation, any Regional Water Quality Control Board and the Environmental Protection Agency.

(f) **Environmental Assessments.** Lender may, in its sole discretion, if it has a reasonable belief to suspect that a violation of the provisions of this Section 10 has occurred, to require Borrower, at its sole cost and expense, to perform or cause to be performed, such studies or assessments of the Property, as Lender may deem necessary or appropriate or desirable, to determine the status of environmental conditions on and about the Property, which studies and assessments shall be for the benefit of Lender and be prepared in accordance with the specifications established by Lender.

(g) **Inspection and Testing.** Borrower hereby confirms the right of Lender (or a receiver appointed by Lender) to enter upon and inspect all or any portion of the Property for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any hazardous substance into, onto, beneath, or from the Property in accordance with Section 2929.5 of the California Civil Code. Such inspections and the tests and studies performed in connection therewith are collectively called the "**Tests and Studies**". All costs and expenses incurred by Lender pursuant to this Section 10(g) or pursuant to Section 2929.5 of the California Civil Code, including, without limitation, costs of consultants and contractors, costs of repair of any physical injury to the Property normal and customary to the Tests and Studies, court costs and attorneys' fees, whether incurred in litigation or not and whether before or after judgment, shall be payable by Borrower and, to the extent advanced or incurred by Lender, shall be reimbursed to Lender by Borrower upon demand. Any and all of such costs and expenses advanced by Lender, together with interest thereon at the rate then in effect under the Note, shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note.

**11. Covenants.** Borrower covenants with Lender:

(a) To warrant and defend title to the Property against all claims and demands, subject to easements and restrictions currently of record;

(b) To provide Lender with notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's knowledge, threatened against or relating to Borrower or the Property.'

**12. Lease.** Borrower shall not, without Lender's prior written consent, execute, modify, amend, surrender or terminate any Lease other than at market rates and in the ordinary course of business. All Leases executed or renewed after the date hereof, must be approved by Lender prior to the execution thereof by Borrower. Borrower shall not be authorized to enter into any ground lease of the Property without Lender's prior written approval. If Lender consents to any new lease or the renewal of any existing lease, at Lender's request, Borrower shall cause the tenant thereunder to execute a subordination and attornment agreement in form and substance satisfactory to Lender. Notwithstanding the foregoing, Borrower may enter into month to month leases without Lender's prior written consent, provided such leases are terminable and on no more than thirty (30) days' written notice. Lender is authorized to foreclose this Deed of Trust subject to the rights of any tenants of the Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by Borrower to be, a defense to any proceedings instituted by Lender to collect the sums secured hereby or to collect any deficiency remaining unpaid after the foreclosure sale of the Property. Unless otherwise agreed by Lender in writing, all leases and tenancies of the Property executed subsequent to the date hereof, or any part thereof, shall be subordinate and inferior to the lien of this Deed of Trust, except that from time to time Lender may execute and record among the land records of the jurisdiction where this Deed of Trust is recorded, subordination statements with respect to such of said leases as Lender may designate, whereby the leases so designated by Lender will be made superior to the lien of this Deed of Trust. From and after the recordation of such subordination statements, the leases therein referred to shall be superior to the lien of this Deed of Trust and shall not be affected by any foreclosure hereof. All such leases and tenancies shall contain a provision to the effect that the tenant recognizes the right of the Lender to effect such subordination of this Deed of Trust and consents thereto. So long as there shall not have occurred an Event of Default, Borrower shall have the right to collect all Rents, and shall hold the same, in trust, to be applied first to the payment of all impositions, levies, taxes, assessments and other charges upon the Property, second to maintenance of insurance policies upon the Property required hereby, third to the expenses of Property operations, including maintenance and repairs required hereby, fourth to the payment of that portion of the Indebtedness then due and payable, and fifth, the balance, if any, to or as directed by Borrower.

**13. Estoppel Certificate.** Borrower shall within ten (10) days after Lender's request, furnish Lender with a written statement, duly acknowledged, setting forth the sums, according to Borrower's books and records, secured by the Loan Documents and any right of set-off, counterclaim or other defense which exists against such sums and the Obligations.

**14. Transfers of the Property or Beneficial Interest in Borrower; Assumption.** If Borrower shall sell, enter into a contract of sale, lease for a term of more than six (6) years (including options to renew), lease with an option to purchase for any term, or transfer all or any part of the Property or an interest therein, excluding (a) the creation of a lien or encumbrance, subordinate to this Deed of Trust, (b) or a transfer by devise, descent, or by operation of law upon the death of a joint tenant Borrower without Lender's prior written consent, the Lender may, at its option declare the Note and any other obligations secured by this Deed of Trust, together with accrued interest thereon, immediately due and payable, in full. No waiver of the Lender's right to accelerate shall be effective unless it is in writing. If Lender exercises such option to accelerate, Lender shall mail Borrower notice of acceleration. Such notice shall provide a period of not less than thirty (30) days from the date the notice is mailed within which Borrower may pay the sums declared due. If Borrower fails to pay such sums prior to the expiration of such period, Lender may, without further notice or demand on Borrower, invoke any remedies permitted by Section 20 hereof.

**15. No Additional Liens, Encumbrances or Indebtedness.** Borrower covenants not to execute any mortgage, security agreement, assignment of leases and rents or other agreement granting a lien (except the liens granted to Lender by the Loan Documents) against, or encumbrance on, the Property or take or fail to take any other action which would result in a lien against the Property or the interest of Borrower in the Property without the prior written consent of Lender; provided that Borrower may in good faith, by appropriate proceeding, contest the validity or amount of any asserted lien and, pending such contest, Borrower shall not be deemed to be in default hereunder if Borrower shall first obtain an endorsement, in form and substance satisfactory to Lender, to the loan policy of title insurance issued by Lender insuring over such lien. Notwithstanding any of the foregoing, Borrower shall not be in default hereunder upon the placement, creation or recording of any mechanics' lien or materialmen's lien against the Property ("Mechanics Liens"), provided that Borrower either removes said Mechanics' Liens within sixty (60) days of recordation, or obtains a bond or bonds in the full amount of the Mechanics' Liens within said time period.

16. **Assignment of Rents and Leases.**

      **(a) Assignment.** Borrower, for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby assign, convey, and deliver unto Lender:

          (i) All of Assignor's right, title and interest in all of the Leases now or hereafter affecting the Land.

          (ii) The immediate and continuing right to collect and receive all of the Rents;

          (iii) Any and all rights and claims of any kind that Assignor may have now or in the future against any Tenant.

To have and to hold the same unto Assignee, its successors and assigns, until termination of this Assignment as hereinafter provided.

      **(b) Absolute Assignment.** The parties intend that this Assignment shall be a present, absolute, and unconditional assignment and shall, immediately upon execution, give Assignee the right to collect the Rents and to apply them in payment of the principal, interest and all other sums payable under the Loan Documents. Such assignment and grant shall continue in effect until the Indebtedness is paid in full. Subject to the provisions set forth herein and provided Borrower has not defaulted in the performance of the terms, covenants, or provision under the Loan Documents or this Assignment, Borrower grants to Lender a license to enforce the Leases and collect the Rents as they become due. Borrower shall deliver such other Rents to Lender as are necessary for the payment of principal, interest and other sums payable under the Loan Documents as such sums become due. Borrower further agrees that Lender may enforce this Assignment without first resorting' to or exhausting any security or collateral for the Loan; however, nothing herein contained shall prevent Lender from exercising any other right under any of the Loan Documents.

      **(c) Power of Attorney.** Borrower hereby irrevocably appoints Lender its true and lawful attorney-in-fact, with full power of substitution and with full power for Lender in its own name and capacity or in the name and capacity of Borrower to demand and collect any and all Rents and to file any claim or take any other action or proceeding and make any settlement regarding the Leases; provided however, Lender shall not exercise such power of attorney unless and until Borrower is in default of any payment or in breach of any material term or provision under the Loan Documents. All Tenants are hereby expressly authorized and directed to pay to Lender, or to such nominee as Lender may designate in writing delivered to such Tenants, all amounts due Borrower pursuant to the Leases. All Tenants are expressly relieved of all duty, liability or obligation to Borrower in respect of all payments so made to Assignee or such nominee.

      **(d) Indemnity.** Borrower hereby agrees to indemnify Lender and to hold Lender harmless from any liability, loss or damage including without limitation, reasonable attorneys' fees, costs and expenses which may or might be incurred by Lender under the Leases or by reason of this Assignment, and from any and all claims and demands which may be asserted against Lender by reason of any terms, covenant or agreement contained in any of the Leases, other than as a result of Lender's active negligence or willful misconduct.

      **(e) Performance of Lease Covenants.** Lender may, at its option, perform any Lease covenant for and on behalf of Borrower and all monies expended in so doing shall be chargeable to Borrower and added to the outstanding principal balance and shall be immediately due and payable with interest thereon at the Note rate.

      **(f) Representations and Warranties.** Borrower represents and warrants and shall be deemed to reaffirm the same upon each disbursement of loan proceeds by Lender to Borrower:

          (i) The Leases are in full force and effect and have not been modified;

          (ii) There are no defaults, defenses or setoffs of either Landlord, or to the best of Borrower's knowledge, Tenant under the Leases nor is there any fact which, with the giving of notice or lapse of time or both, would constitute a default under the Leases;

          (iii) The sole ownership of the entire Landlord's interest in the Leases is vested in Borrower and the Leases have not been otherwise assigned or pledged;

          (iv) All Rents due to date have been collected, no Rent has been collected in advance (other than rent paid one month in advance, security deposits or the last months rent), and no Tenant has been granted any Rent concession or inducement whatsoever other than as disclosed to Lender in writing; and

          (v) There are no Leases on the Property except those Leases specified by Borrower in the Loan Documents.

      **(g) Covenants and Agreements.** Borrower hereby covenants and agrees as follows:

          (i) Borrower shall not permit any Rent under any Lease of the Property to be collected more than thirty (30) days in advance of the due date thereof.

          (ii) Borrower shall act promptly to enforce all available remedies against any delinquent Tenant to protect the interest of the Landlord under the Leases and to preserve the value of the Property.

          (iii) Borrower shall comply with and perform in a complete and timely manner all of its obligations as Landlord under all Leases. Borrower shall give notice to Lender of any material default by Borrower under any Lease or by any Tenant under any non-residential Lease in such time to afford Lender an opportunity to cure any such default prior to the Tenant having any right to terminate the Lease. Borrower shall also provide Lender with notice of the commencement of an action or ejectment or any summary proceedings for dispossession of the Tenant under any of the Leases.

(iv) Borrower shall furnish promptly to Lender the original or certified copies of all Leases now existing or hereafter created. Lender shall have the right to notify any Tenant at any time and from time to time of any provision of the Loan Documents.

(v) Borrower shall not permit any Leases to be made of the Property or existing Leases to be modified, terminated, extended or renewed without the prior written consent of Lender.

17. **Borrower and Lien Not Released.** Without affecting the liability of Borrower or any other person liable for the payment of the Indebtedness and without affecting the lien or charge of this Deed of Trust as security for the payment of the indebtedness, Lender may from time to time and without notice to any junior lien holder or holder of any right or other interest in and to the Property; (a) release any person so liable; (b) waive or modify any provision of this Deed of Trust or the other Loan Documents or grant other indulgences; (c) release all or any part of the Property; (d) take additional security for any obligation herein mentioned; (e) subordinate the lien or charge of this Deed of Trust; (f) consent to the granting of any easement; or (g) consent to any map or plan of the Property.

18. **California Commercial Code Security Agreement.**

(a) This Deed of Trust shall constitute a security agreement pursuant to the California Commercial Code for any portion of the Property which, under applicable law may be subject to a security interest pursuant to the California Commercial Code (such portion of the Property is hereinafter called the **"Personal Property"**) and Borrower hereby grants to Lender a security interest in the Personal Property. Any reproduction of this Deed of Trust or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender any financing statements as well as extensions, renewals and amendments thereof, and reproductions of this Deed of Trust in such form as Lender may require to perfect a security interest with respect to the Personal Property. Borrower hereby authorizes and empowers Lender and irrevocably appoints Lender its agent and attorney-in-fact to execute and file, on Borrower's behalf, all financing statements and refilings and continuations thereof as Lender deems necessary or advisable to create, preserve and protect such lien. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements as Lender may reasonably require. Without limitation of the foregoing, if an Event of Default occurs, Lender shall be entitled immediately to exercise all remedies available to it under the California Commercial Code.

(b) Any party to any contract subject to the security interest granted herein shall be entitled to rely on the rights of Lender without the necessity of any further notice or action by Borrower. Lender shall not by reason of this Deed of Trust or the exercise of any right granted hereby be obligated to perform any obligation of Borrower with respect to any portion of the Personal Property nor shall Lender be responsible for any act committed by Borrower, or any breach or failure to perform by Borrower with respect to any portion of the Personal Property.

(c) Borrower shall not, without the prior written consent of Lender, sell, assign, transfer, remove or permit to be removed from the Property any of the Personal Property. So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Property, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property. Any replacement or substituted Personal Property shall be subject to the security interest granted herein.

(d) To the extent permitted by law, Borrower and Lender agree that with respect to all items of Personal Property which are or will become fixtures on the Land, this Deed of Trust, upon recording or registration in the real estate records of the proper office, shall constitute a "fixture filing" within the meaning of Sections 9102 and 9502 of the California Commercial Code. Borrower is the record Owner of the Land.

(e) Without in any way affecting Lender's security interest in the Personal Property, it is expressly understood and agreed as follows:

(i) Borrower shall, at Borrower's expense, promptly take all actions necessary to obtain all proceeds to which Borrower is entitled in connection with the Personal Property, including, without limitation, the filing of any applications or claims and the prosecution of appeals or litigation, if necessary;

(ii) Borrower shall direct the payer with regard to any of the Personal Property to remit same directly to Lender when due;

(iii) Borrower shall forward promptly to Lender (a) all notices and correspondence relating in any manner to the Personal Property, and (b) any proceeds received by Borrower in connection with any of the Personal Property;

(iv) if an Event of Default has occurred, the proceeds of any of the Personal Property received by Lender shall be applied toward the repayment of the Note, or if an Event of Default has not occurred said proceeds shall be deposited by Borrower with Lender subject to the security interest granted herein and applied from time to time toward the payment of any expenses relating to the Property; and

(v) effective upon the occurrence of an Event of Default, Lender shall be and is irrevocably appointed as Borrower's attorney-in-fact (such power of attorney being deemed to be coupled with an interest) to take all such actions on behalf of Borrower that Lender deems necessary and expedient in order to obtain all proceeds to which Borrower is entitled with respect to any of the Personal Property.

**19. Events of Default. Acceleration of Indebtedness.** The occurrence of any one or more of the following events shall constitute an "Event of Default", under this Deed of Trust:

**(a)** Failure of Borrower to pay, on or before ten (10) days of the due date, any of the Indebtedness, including any payment due under the Note; or

**(b)** Failure of Borrower to strictly comply with Sections 4(a)(i) (insurance), 7 (inspection), 10 (environmental matters), 14 (prohibition on transfers), and 15 (no additional liens) of this Deed of Trust, provided, however, Borrower shall have the following time periods following written notice and demand from Lender or Lender's agent within which to cure the failure to strictly comply: (1) Section 10 - thirty (30) business days to commence to cure and thirty (30) days to complete the cure, unless the cure involves an environmental remediation of the Property, in which case the time period to complete the cure shall be extended so long as Borrower is diligently pursuing the cure; (2) Transfers of interests in Borrower in violation of Section 14 -ten (10) business days; (3) Junior encumbrances against the Property in violation of Section 15 - ten (10) business days; or

**(c)** A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days of its filing), or a custodian, receiver or trustee for any of the Property is appointed, or Borrower makes an assignment for the benefit of creditors, is adjudged insolvent by any state or federal court of competent jurisdiction, or admits its insolvency or inability to pay its debts as they become due or an attachment or execution is levied against any of the Property; or

**(d)** The occurrence of a default following applicable notice cure periods under and as defined in any other Loan Document; or

**(e)** Borrower shall default in the payment of any indebtedness (other than the Indebtedness) and such default is declared and is not cured within the time, if any, specified therefore in any agreement governing the same; or

**(f)** Any material statement, report or certificate made or delivered to Lender by Borrower or any Principal is not materially true and complete at any time; or

**(g)** Failure of Borrower, within thirty (30) days after notice and demand, to satisfy each and every Obligation not set forth in the subsections above; provided, however, if such Obligation cannot by its nature be cured within thirty (30) days, and if Borrower commences to cure such failure promptly after written notice thereof and thereafter diligently pursues the curing thereof (and then in all events cures such failure within sixty (60) days after the original notice thereof), Borrower shall not be in default hereunder during such period of diligent curing.

All notices and cure periods described herein shall not be applicable to any event which with the giving of notice, the passage of time or both would constitute an Event of Default, if such event has occurred as of the date on which Lender commences a nonjudicial foreclosure proceeding with respect to another Event or Events of Default. Such event shall constitute an independent Event of Default hereunder. Upon the occurrence of an Event of Default at the option of Lender, the Indebtedness shall become immediately due and payable without notice to Borrower and Lender shall be entitled to all of the rights and remedies provided in the Loan Documents or at law or in equity. Each remedy provided in the Loan Documents is distinct and cumulative to all other rights or remedies under the Loan Documents or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

**20. Entry; Foreclosure.**

**(a)** **Surrender Possession.** Upon the occurrence or an Event of Default, Borrower, upon demand of Lender, shall forthwith surrender to Lender the actual possession of the Property, or to the extent permitted by Law, Trustee or Lender, or their officers or agents or a receiver appointed by a court of competent jurisdiction, may enter and take possession of all or any part of the Property, and may exclude Borrower and its agents and employees wholly therefrom, and may have joint access with Borrower to the books, papers and accounts of Borrower. if Borrower shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by Lender, Trustee or such receiver may obtain a judgment or decree conferring on Lender or Trustee or such receiver the right to immediate possession of the Property or requiring the delivery of the Property to Lender, Trustee or such receiver, and Borrower specifically consents to the entry of such judgment or decree. Upon every such entering upon or taking of possession, Lender may hold, store, use, operate, manage and control the Property and conduct the business thereof, and Lender or such receiver may take any action required by applicable law or which Lender or such receiver believes necessary to enforce

compliance with the environmental provisions contained herein or in the other Loan Documents, and negotiate with governmental authorities with respect to the Property's environmental compliance and remedial measures in connection therewith. Lender and such receiver and their representatives shall have no liability for any loss, damage, injury, cost or expense resulting from any action or omission which was taken or omitted in good faith.

(b) **Pursue Remedies.** When the Indebtedness or any part thereof shall become due, whether by acceleration or otherwise, Lender may, either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or by any other appropriate proceeding or remedy to;

(i) enforce payment of the Note or the performance of any term, covenant, condition or agreement of Borrower under any of the Loan Documents;

(ii) foreclose the lien hereof for the Indebtedness or part thereof by power of sale, commencement of action or otherwise, as more particularly described in Section 20(c) below or otherwise and sell the Property as an entirety or otherwise, as Lender may determine; and/or

(iii) pursue any other right or remedy available to it under or by the law and decisions of the State in which the Land is located. Notwithstanding any statute or rule of law to the contrary, the failure to join any tenant or tenants of the Property as party defendant or defendants in any foreclosure action or the failure of any such order or judgment to foreclosure their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect (a) the Indebtedness, or any part thereof or (b) any deficiency remaining unpaid after foreclosure and sale of the Property.

(c) **Trustee's Sale.** Should Lender elect to foreclose by exercise of the power of sale contained herein, Lender shall notify Trustee and shall, if required, deposit with Trustee the Note, the original or a certified copy of this Deed of Trust, and such other documents, receipts and evidences of expenditures made and secured hereby as Trustee may require. (i) Upon receipt of such notice from Lender, Trustee shall cause to be recorded and delivered to Borrower such notice of default as may then be required by law and by this Deed of Trust. Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale has been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to the purchaser or purchasers at such sale its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without limitation, Borrower, Trustee or Lender, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers. (ii) Trustee may postpone the sale of all or any portion of the Property from time to time in accordance with the laws of the State in which the Land is located. (iii) To the fullest extent allowed by law, Borrower hereby expressly waives any right which it may have to direct the order in which any of the Property shall be sold in the event of any sale or sales pursuant to this Deed of Trust.

(d) **Mixed Collateral.** Upon the occurrence of an Event of Default under this Deed of Trust, Lender, pursuant to appropriate statutory provisions, shall have an option to proceed with respect to both the real property portion of the Property and the Personal Property in accordance with its rights, powers and remedies with respect to such real property. Such option shall be revocable by Lender as to all or any portion of the Personal Property at any time prior to the sale of the remainder of the Property. In such event Lender shall designate Trustee to conduct the sale of the Personal Property in combination with the sale of the remainder of the Property. Should Lender elect to sell the Personal Property or any part thereof which is real property or which Lender has elected to treat as real property or which may be sold together with the real property as provided above, Lender or Trustee shall give such notice of default and election to sell as may then be required by law. The parties agree that if Lender shall elect to proceed with respect to any portion of the Personal Property separately from such real property, five (5) days notice of the sale of the Personal Property shall be reasonable notice. The reasonable expenses of retaking, holding, preparing for sale, selling and the like incurred by Lender shall include, but not be limited to, reasonable attorneys' fees, costs and expenses, and other expenses incurred by Lender,

(e) **Rescission of Notice of Sale.** Lender may from time to time rescind any notice of default or notice of sale before any Trustee's sale as provided above in accordance with the laws of the State in which the Land is located. The exercise by Lender of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Lender to execute and deliver to Trustee, as above provided, other declarations or notices of default to satisfy the obligations of this Deed of Trust, or otherwise affect any provision, covenant, or condition of any Loan Document or any of the rights, obligations or remedies of Trustee or Lender hereunder or thereunder.

(f) **Rights and Remedies Cumulative.** Trustee and Lender shall have all powers, rights and remedies under applicable law whether or not specifically or generally granted or described in this Deed of Trust. Nothing contained herein shall be construed to impair or to restrict such powers, rights and remedies or to preclude any procedures or process otherwise available to trustees or beneficiaries under deeds of trust in the State in which the Land is located. Trustee and Lender, and each of them, shall be entitled to enforce the payment and performance of the Indebtedness or the obligations and to exercise all rights and powers under this Deed of Trust or under any other Loan Document or other agreement of any laws now or hereafter in force, notwithstanding the fact

that some or all of the Indebtedness and the Obligations may now or hereafter be otherwise secured, whether by Deed of Trust, mortgage, pledge, lien, assignment or otherwise. Neither the acceptance of this Deed of Trust nor its enforcement, whether by court action or pursuant to the power of sale or other powers contained herein, shall prejudice or in any manner affect Trustee's or Lender's right to realize upon or enforce any other rights or security now or hereafter held by Trustee and Lender. Trustee and Lender, and each of there, shall be entitled to enforce this Deed of Trust and any other rights or security now or hereafter held by Lender or Trustee in such order and manner as they or either of them may in their absolute discretion determine. No remedy herein conferred upon or reserved to Trustee or Lender is intended to be exclusive of any other remedy contained herein or by law provided or permitted, but each shall to the extent permitted by law be cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity. Every power or remedy given by any of the Loan Documents to Trustee or Lender, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by Trustee or Lender, and either of them may pursue inconsistent remedies. By exercising or by failing to exercise any right, option or election hereunder, Lender shall not be deemed to have waived any provision hereof or to have released Borrower from any of the obligations secured hereby unless such waiver or release is in writing and signed by Lender. The waiver by Lender of Borrower's failure to perform or observe any term, covenant or condition referred to or contained herein to be performed or observed by Borrower shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent failure of Borrower to perform or observe the same or any other such term, covenant or condition referred to or contained herein, and no custom or practice which may develop between Borrower and Lender during the term hereof shall be deemed a waiver of or in any way affect the right of Lender to insist upon the performance by Borrower of the obligations secured hereby in strict accordance with the terms hereof or of any other Loan Document.

(g) **Waiver of Lien.** In accordance with California Code of Civil Procedure Section 726.5, Lender may waive its lien against the Property or any portion thereof, together with fixtures or personal property thereon, to the extent such property is found to be environmentally impaired, and may exercise any and all rights and remedies of an unsecured creditor against Borrower and all of Borrower's assets and property for the recovery of any deficiency, including, without limitation, seeking an attachment order under California Code of Civil Procedure Section 483.010. No such waiver shall be final or binding on Lender unless and until a final money judgment is obtained against Borrower. As between Lender and Borrower, for purposes of California Code of Civil Procedure Section 726.5, Borrower shall have the burden of proving that the release or threatened release was not knowingly or negligently caused or contributed to, or knowingly or willfully permitted or acquiesced to by Borrower or any related party (or any affiliate or agent of Borrower or any related party) and that Borrower made written disclosure of the release to Lender or that Lender otherwise obtained actual knowledge thereof prior to the making of the loan evidenced by the Note. Notwithstanding anything to the contrary contained in this Deed of Trust or the other Loan Documents, Borrower shall be fully and personally liable for all judgments and awards entered against Borrower pursuant to California Code of Civil Procedure 726.5 and such liability shall be an exception to any non-recourse or exculpatory provision in this Deed of Trust or the other Loan Documents and shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Borrower's obligations hereunder shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Property or this Deed of Trust. For the purpose of any action brought under this Section, Borrower hereby waives the defense of laches and any applicable statute of limitations. For purposes of California Code of Civil Procedure 726.5, the acts, knowledge and notice of each "726.5 Party" shall be attributed to and be deemed to have been performed by the party or parties then obligated on and liable for payment of the Note. As used herein, "**726.5 Party**" shall mean Borrower, any successor owner to Borrower of all or any portion of the Property, any related party of Borrower or any such successor and any affiliate or agent of Borrower, any such successor or any such related party.

(h) **Action for Environmental Claims.** In accordance with, and subject to limitations of, California Code of Civil Procedure Section 736, Lender may seek a judgment that Borrower has breached its covenants, representations and/or warranties with respect to the environmental matters contained in Section 10(a) through (g) of this Deed of Trust (the ("**Environmental Provisions**"), and may commence and maintain an action or actions in any court of competent jurisdiction for enforcement of the Environmental Provisions and/or recovery of any and all costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other out-of-pocket costs or expenses (including, without limitation, court costs, consultants' fees and attorneys' fees, whether incurred in litigation or not and whether before or after judgment), incurred or advanced by Lender pursuant to the Environmental Provisions (collectively, the "**Environmental Costs**"), excluding, however, any Environmental Costs that are not permitted to be recovered pursuant to Section 736 of the California Code of Civil Procedure. Environmental Costs that are not permitted to be recovered pursuant to Section 736 may be referred to hereinafter as the "**Unsecured Environmental Costs**", and Environmental Costs other than the Unsecured Environmental Costs may be referred to hereinafter as the "**Secured Environmental Costs**". Any Unsecured Environmental Costs shall not be secured by this Deed of Trust; however, nothing herein shall prevent Lender from recovering any Unsecured Environmental Costs pursuant to the unsecured Hazardous Materials Indemnity Agreement of even date herewith among Borrower, Lender and certain other parties, to the extent they are recoverable in accordance with said Indemnity Agreement. All Secured Environmental Costs incurred by Lender shall bear interest at the default rate provided under the Note. All secured Environmental Costs together with interest thereon at the rate then in effect under the Note shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Note. Borrower acknowledges and agrees that notwithstanding any term or provision contained in this Deed of Trust or in the other Loan Documents, Environmental Costs shall be

exceptions to any nonrecourse or exculpatory provision, if any, and Borrower shall be fully and personally liable for Environmental Costs. Such liability shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Borrower's obligations hereunder shall survive foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Property or this Deed of Trust. For the purposes of any action brought under this subparagraph, Borrower hereby waives the defense of laches and any applicable statute of limitations.

21. **Expenditures and Expenses.** In any action to foreclose the lien hereof or otherwise enforce Lender's rights and remedies hereunder, there shall be allowed and included as additional Indebtedness all expenditures and expenses which may be paid or incurred by or on behalf of Lender including repair costs, payments to remove or protect against liens, attorneys' fees, costs and expenses, receivers' fees, appraisers' fees, engineers' fees, accountants' fees; and any fees, costs and expenses in connection with any Tests and Studies; outlays for documentary and expert evidence, stenographers' charges, stamp taxes, publication costs, and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title searches and examination, title insurance policies, and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute any action or to evidence to bidders at any sale which may be had pursuant to an order or judgment the true condition of the title to, or the value of, the Property. All expenditures and expenses of the nature mentioned in this Section 21 and such costs, expenses and fees as may be incurred or as may be owing by Lender in the protection of the Property and the maintenance of the lien of this Deed of Trust, including the fees, costs and expenses of any attorneys employed by Lender in any litigation or proceeding affecting this Deed of Trust, the Note, the other Loan Documents or the Property; including probate, appellate and bankruptcy proceedings, or in preparations for the commencement or defense of any action or proceeding or threatened action or proceeding, including costs and expenses in connection with obtaining any court order or the appointment of a receiver to enforce Lender's rights pursuant to Section 564 of the California Code of Civil Procedure and/or Section 2929.5 of the California Civil Code, shall be immediately due and payable to Lender, with interest thereon at the default rate set forth in the Note, and shall be secured by this Deed of Trust. In addition to the foregoing award of attorney's fees and costs, Lender shall be entitled to its attorneys' fees and costs incurred in any post-judgment proceedings to collect or enforce any judgment or order relating to this Deed of Trust, the Note secured hereby or the other Loan Documents. This provision is separate and several and shall survive the merger of this provision into any judgment.

22. **Application of Proceeds of Foreclosure Sale.** After deducting all costs, fees and expenses of Trustee and of this Deed of Trust, including, without limitation, costs of evidence of title and actual and customary attorneys' fees of Trustee and Lender in connection with a sale as provided in Section 20(c)(i) above, the proceeds of any foreclosure sale of the Property shall be distributed and applied in the order of priority set forth in the Note with the remainder, if any, to be distributed to the person or persons legally entitled thereto.

23. **Appointment of Receiver.** If an Event of Default is continuing or if Lender shall have accelerated the Indebtedness, Lender upon application to a court of competent jurisdiction, whether in conjunction with Lender's commencement of judicial proceedings to foreclose the lien hereof, or pursuant to other proceedings, shall be entitled as matter of strict right, without notice, and without regard to the occupancy or value of the Property or any other security for the Indebtedness or the insolvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Property or any portion thereof, and to collect and apply the Rents, and Borrower hereby irrevocably consents to such appointment and waives notice of any application therefor. In addition, Lender shall have the right to appoint a receiver when permitted under Section 564 of the California Code of Civil Procedure, including, without limitation, in order to enforce Lender's rights under Section 2929.5 of the California Civil Code as described in Section 10(g). The receiver shall have all of the rights and powers to the fullest extent permitted by law. The receiver shall have the right to apply Rents to cleanup, remediation or other response action concerning the release or threatened release of Hazardous Materials, whether or not such actions are pursuant to an order of any federal, state or local governmental agency.

24. **After-Acquired Property.** To the extent permitted by, and subject to, applicable law, the lien of this Deed of Trust, including without limitation the security interest created under the granting clauses of this Deed of Trust, shall automatically attach, without further act, to all property hereafter acquired by Borrower located in or on, or attached to, or used or intended to be used in connection with, or with the operation of, the Property or any part thereof.

25. **Future Advances.** This Deed of Trust is given to secure not only the existing Indebtedness, but also payment and performance of all future advances and other obligations that Borrower or any successor in ownership of all or part of the property may agree to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, when a writing evidences the parties' agreement that the advance or obligation be secured by this Deed of Trust.

26. **Trustee Provisions.**

(a)      From time to time upon written request of Lender and presentation of this Deed of Trust for endorsement and without affecting the personal liability of any person for payment of the Indebtedness or performance of the Obligations, Trustee may, without liability therefor and without notice: reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof. Trustee or Lender may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trusts hereunder and the enforcement of the rights and remedies

(b)    available hereunder, and Trustee or Lender may obtain order or decrees directing or confirming or approving acts in the execution of such trusts and the enforcement of such remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Deed of Trust. Borrower shall pay to Trustee reasonable compensation and reimbursement for services and expenses in the enforcement of the trusts created hereunder, including reasonable attorney's fees. Borrower shall indemnify Trustee and Lender against all losses, claims, demands and liabilities which either may incur, suffer or sustain in the execution of the trusts created hereunder or in the performance of any act required or permitted hereunder or by law.

(c)    From time to time, by a writing signed by Lender, Lender may appoint another trustee to act in the place and stead of Trustee or any successor, with the same effect as if originally named Trustee herein.

27. **Disclosure of Information.** Borrower agrees that Lender shall have the right (but shall be under no obligation) to make available to any party for the purpose of granting participations in or selling, transferring, assigning or conveying all or any part of the Loan (including, without limitation, any governmental agency or authority and any prospective bidder at any foreclosure sale of the Property), any and all information which Lender may have with respect to the Property, whether provided by Borrower or any third party or obtained as a result of any Tests and Studies pursuant to Section 10(g). Borrower agrees that Lender shall have no liability whatsoever as a result of delivering any such information to any third party, and Borrower, on behalf of itself and its successors and assigns (including, without limitation, any purchaser at a foreclosure sale), hereby releases and discharges Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party.

28. **Sale of Loan.** Lender, at any time and without the consent of Borrower, may grant participations in or sell, transfer, assign and convey all or any portion of its right, title and interest in and to the Loan, this Deed of Trust and the other Loan Documents, guaranties given in connection with the Loan and any collateral given to secure the Loan.

29. **Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy under any of the Loan Documents, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. Lender's acceptance of payment of any sum secured by any of the Loan Documents after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the Indebtedness, nor shall Lender's receipt of any awards, proceeds or damages under Section 4 hereof operate to cure or waive Borrower's default in payment of sums secured by any of the Loan Documents. With respect to all Loan Documents, only waivers made in writing by Lender shall be effective against Lender.

30. **Waiver of Statute of Limitations.** Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien created by any of the Loan Documents or to any action brought to enforce the Note or any other obligation secured by any of the Loan Documents.

31. **Waiver of Homestead and Redemption.** Borrower hereby waives all right of homestead exemption in the Property. Borrower hereby waives all right of redemption on behalf of Borrower and on behalf of all other persons acquiring any interest or title in the Property subsequent to the date of this Deed of Trust, except decree or judgment creditors of Borrower.

32. **Governing Law; Severability.** This Deed of Trust shall be governed by and construed in accordance with the internal laws of the State of the jurisdiction in which the Land is located. The invalidity, illegality or enforceability of any provision of this Deed of Trust shall not affect or impair the validity, legality or enforceability of the remainder of this Deed of Trust and to this end, the provisions of this Deed of Trust are declared to be severable.

33. **Notice.** Any notice or other communication required or permitted to be given shall be in writing addressed to the respective party at their addresses set forth above and may be personally served, telecopied or sent by overnight courier or U.S. Mail and shall be deemed given; (a) if served in person when served; (b) if telecopied, on the date of transmission; provided that a hard copy of such notice is also sent pursuant to clause (c) or (d) below; (c) if by overnight courier, on the first business day after delivery to the courier; or (d) if by U.S. Mail, on the third (3rd) day after deposit in the mail, postage prepaid, certified mail, return receipt requested.

34. **Successors and Assigns Bound; Joint and Several Liability; Agents; Captions.** The covenants and agreements contained in the Loan Documents shall bind, and the rights thereunder shall inure to, the respective successors and assigns of Lender and Borrower subject to the provisions of Section 14 hereof. All covenants and agreements of Borrower shall be joint and several in the event that there is more than one individual or entity comprising Borrower or in the event that Borrower's obligations are succeeded to by one or more successors or assigns. In exercising any rights under the Loan Documents or taking any actions provided for therein, Lender may act through its employees, agents or independent contractors as authorized by Lender. The captions and heading of the paragraphs of this Deed of Trust are for convenience only and not to be used to interpret or define the provisions hereof.

35. Release. Upon payment of all sums secured by this Deed of Trust, Lender shall release and reconvey this Deed of Trust. Borrower shall pay Lender's reasonable costs incurred in releasing this Deed of Trust and any financing statements related hereto.

36. Business Day. As used in the Loan Documents "business day" means any day, other than a Saturday or a Sunday when banks in Los Angeles, California are not required to be closed.

37. Loss of Note. Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of indemnity, reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note.

38. Time of Essence. Time is of the essence of this Deed of Trust and the performance of each of the covenants and agreements contained herein.

39. Multiple Lenders. If the beneficial interests in this Deed of Trust are held by multiple lenders, the Lenders have agreed in writing to be governed by the desires of the holders of more than 50% of the record beneficial interests herein with respect to actions taken on behalf of all holders in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the Broker, servicing agent, or other person acting on their behalf, and the sale, encumbrance or lease of real property owned by holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust or has caused the same to be executed by its duly authorized representatives as of the date first above written.

AME Zion Western Episcopal District, a California religious corporation

*Sandra K Davis*    4/14/2020

by Dr. Sandra Davis, Trustee
Western Episcopal District    Date

_____    _____
Date

(FOR BORROWER NOTARIZATION)

> *A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

State of California
County of

Charles G Fregoso
Notary Public

On 4-14-2020 before me, _____
    Date    Here Insert Name and Title of the Officer
Personally appeared Dr. Sandra Davis _____
    Name(s) of signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CHARLES GILBERT FREGOSO
COMM. # 2167011
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
MY COMM. EXP. OCT. 3, 2020

Place Notary Seal Above

Signature _____
    Signature of Notary Public

***************************************************************************************************

### REQUEST FOR FULL
### RECONVEYANCE

TO Chicago Title Company, TRUSTEE:

    The undersigned is the holder of the note or notes secured by this Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing. Said note or notes together with all other Indebtedness secured by this Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, Security Agreement, Assignment of Leases and Rents And Fixture Filing, which are delivered hereby and to reconvey, without warranty, all the estate now held by you under this Deed of Trust, Security Agreement, Assignment of Leases and Rents And Fixture Filing to the person or persons legally entitled thereto.


_____   Date: _____

Jeffrey Scott Bleecker, as Trustee of the Bleecker Family Trust, as to an undivided 42.8413% interest


_____   Date: _____

Lance Evic, a married man sole and separate, as to an undivided 16.3565% interest


_____   Date: _____

Lisa Motes, a singel woman, as to an undivided 40.8022% interest

## EXHIBIT "A" – LEGAL DESCRIPTION

PROPERTY COMMONLY KNOWN AS: 1449 W. Adams, Los Angeles, CA 90007

APN# : 5054-027-018

The land referred to herein below is situated in the City of Los Angeles, County of Los Angeles, State of California and is described as follows:

The west half of Lot 7 and all of Lots 8, 9, 10, 11 and 35 of Kenwood Park Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in book 23, records in the Office of the county recorder of Said County.

# EXHIBIT "F"

**1972 Grant Deed**

RECORDING REQUESTED BY

859

AND WHEN RECORDED MAIL TO

Name **AFRICAN METHODIST**
Street **EPISCOPAL CHURCH**
Address **1449 West Adams Boulevard**
City & **Los Angeles, Calif. 90007**
State

MAIL TAX STATEMENTS TO

Name
Street    *SAME AS ABOVE*
Address
City &
State

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.
FOR TITLE INSURANCE & TRUST CO

**NOV 22 1972** AT 8 A.M.

Registrar-Recorder

FEE
$4
2C

SPACE ABOVE THIS LINE FOR RECORDER'S USE

DOCUMENTARY TRANSFER TAX $ ___195.80___
✓ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
☐ OR COMPUTED ON FULL VALUE LESS LIENS AND
ENCUMBRANCES REMAINING AT TIME OF SALE.

_Signature of Declarant or Agent determining tax. Firm Name_

D.T.T. $

# Corporation Grant Deed

TO 406 CA (7-68)     THIS FORM FURNISHED BY TITLE INSURANCE AND TRUST COMPANY

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

    **SYNOD OF SOUTHERN CALIFORNIA, a religious corporation**

hereby GRANTS to

    **(See Attached Exhibit "A")**

the following described real property in the    **City of Los Angeles**
County of    **Los Angeles**        , State of California:

    The west half of Lot 7, and all of Lots 8, 9, 10, 11
    and 35 of Kenwood Park Tract, in the City of Los Angeles,
    County of Los Angeles, State of California, as per map
    recorded in book 23 page 51, Miscellaneous Records of
    said county.

In Witness Whereof, said corporation has caused its corporate name and seal to be affixed hereto and this instrument to be executed by its_____President and____Controller____Secretary, thereunto duly authorized.

Dated: **November 6, 1972**

SYNOD OF SOUTHERN CALIFORNIA

By *Arthur L. Walton* President

By *S. L. Courtice* Controller Secretary

STATE OF CALIFORNIA
COUNTY OF____Los Angeles____} SS.

On ____November 10, 1972____ before me, the undersigned, a Notary Public in and for said State, personally appeared ____Arthur L. Walton____ known to me to be the____President, and ____S. L. Courtice____ known to me to be the Controller ____Secretary____ of the Corporation that executed the within Instrument known to me to be the persons who executed the within Instrument on behalf of the Corporation therein named, and acknowledged to me that such Corporation executed the within Instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Signature _____

Name (Typed or Printed)

OFFICIAL SEAL
**E. H. PRATT, JR.**
NOTARY PUBLIC · CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Expires Sept. 13, 1975
(This area for official notarial seal)

Title Order No._____    Escrow No.__71 43 334-WJS:gg__

MAIL TAX STATEMENTS AS DIRECTED ABOVE

NOV 22 1972

859

EXHIBIT "A"

GRANTEES

JOE JOHNSON, THEON E. SIMMONS, GEORGE BUFORD,
CECIL B. MANNING, JAMES E. WILLIAMS, ISAAC JONES,
LORENZO HARRIS, K. MELVIN TAYLOR, MAYME A. SMITH,
MAGGIE E. SHEPARD, JULIA BUSH, as Trustees for the
African Methodist Episcopal Zion Church, a religious
corporation, in trust that said premises shall be
used, kept maintained, and disposed of as a place of
Divine Worship for the use of the Ministry, and
Membership of the African Methodist Episcopal Zion
Church in America, subject to the provisions of the
Discipline, Usage, and Ministerial appointments of
said Church, as from time to time authorized and
declared by the General Conference of said Church,
and by the Annual Conference within whose bounds
the said premises are situated. This provision is
solely for the benefit of the grantee, and the grantor
reserves no right or interest in said premises.

NOV 22 1972

859